[Cite as *Bigler v. Personal Serv. Ins. Co.*, 2014-Ohio-1467.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| DENNIS BIGLER, et al., | ) | |
| | ) | CASE NO.   12 BE 10 |
| PLAINTIFFS-APPELLEES, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| PERSONAL SERVICE INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS:         Civil Appeal from Common Pleas Court,
                                  Case No. 05CV139.

JUDGMENT:                         Affirmed.

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  March 31, 2014

[Cite as *Bigler v. Personal Serv. Ins. Co.*, 2014-Ohio-1467.]

APPEARANCES:

For Plaintiffs-Appellees:

Attorney Harry White
151 West Main Street
St. Clairsville, Ohio  43950
(For Biglers)


Attorney James Bordas
1358 National Road
Wheeling, West Virginia  26003
(For Coxes)


For Defendants-Appellants:

Attorney Craig Pelini
Attorney Randall Traub
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio  44720
(For Personal Service Insurance Co.)


Attorney Thomas Mulvey
Attorney Lisa Haase
8000 Ravine's Edge Court, Suite 103
Columbus, Ohio  43235
(For Personal Service Insurance Co.)

VUKOVICH, J.

**{¶1}** Defendant-appellant Personal Service Insurance Company appeals after a jury verdict was entered against it in the Belmont County Common Pleas Court based upon the insurance company's denial of coverage and subsequent refusal to defend Kathryn and Donald Cox. Mr. Cox had been sued by the Biglers due to an accident which killed their son and injured Mr. Bigler, and the Biglers obtained a judgment against Mr. Cox after a bench trial. In the third-party portion of the action at issue here, the court ruled that coverage existed as a matter of law, and the jury then found against the insurance company on the bad faith claim.

**{¶2}** The insurance company sets forth twelve assignments of error. The threshold issue involves the trial court's summary judgment decision that there was coverage as a matter of law because an SR-22 certificate of insurance was filed with the BMV but the insurance company never filed the statutorily required SR-26 notice of cancellation with the BMV. We are asked to determine whether the issuance of a certified policy and an SR-22 certificate of insurance requires the insurer to file with the BMV the statutorily-required SR-26 notice of cancellation where: the insurance agent placed the insured's social security and date of birth but not his name and address on the SR-22, the insured delivered the SR-22 to the BMV at the instructions of the agent and obtained his license, the BMV returned the SR-22 to the insurance company weeks later for correction, the insurance company did not correct the SR-22 because they had already sent a letter to the insured purporting to cancel the policy due to a change of mind about his risk and because the effective date of that cancellation had already passed. For the reasons set forth below, the trial court's decision on the SR-22/SR-26 issue is upheld.

**{¶3}** The insurance company also urges that the policy was void ab initio because Mr. Cox's prior criminal record was not disclosed on the application. However, the insurance company could not use this doctrine due to a statute stating that the liability of the insurer who issued a certified policy such as this is conclusive when damage occurs and that no statement of the insured or on the insured's behalf shall defeat or void the policy. There are also multiple evidentiary and trial issues

presented, and a limited weight of the evidence argument is set forth involving Mr. Cox's failure to testify with regard to punitive damages. The insurer also proceeds under principles of cumulative error. These arguments are overruled.

{¶4} The insurance company lastly contends that it was unreasonable to award all of the requested attorneys' fees, which included a 2.0 multiplier, complaining that the time records were reconstructed and were not maintained contemporaneously with the work, that the lowest increment billed was a quarter of an hour, and that $400 is not a reasonable hourly rate. Considering all of the circumstances of this case, we defer to the trial court's discretionary decision made after presiding over this case for many years as we cannot conclude that the court acted unreasonably or that the amount of attorneys' fees is so high as to "shock the conscience."

{¶5} For the reasons explained below, the judgment of the trial court is hereby affirmed.

STATEMENT OF THE CASE

{¶6} On February 5, 2003, Donald and Kathryn Cox went to Boyle Insurance Agency Inc. to apply for insurance. Insurance agent George Gacek filled out their application. He was informed that Mr. Cox had lost his driver's license due to a 12-point suspension and that he was now eligible to have his license reinstated if he obtained an SR-22 certificate of insurance. The agent did not run an MVR check, leaving that matter for the insurance company. He sold the Coxes a car insurance policy through Personal Service Insurance Company, accepting payment of the initial premium and providing Mr. Cox with an SR-22 certificate of insurance from Personal Service Insurance Company for him to bring to the BMV. Mr. Cox brought this copy to the BMV, and a second copy may have been provided to the BMV thereafter by the agency or the company. Mr. Cox had his driving privileges reinstated and then received a new driver's license.

{¶7} The policy (with a February 5, 2003 effective date) was issued by the insurance company on February 11, 2003. It provided full coverage, including $25,000 per person and $50,000 per accident in liability coverage. The policy stated

that it could be canceled for any reason within the first 89 days provided the date of cancellation is at least 10 days after notice of cancellation is mailed. The policy was initially going to cancel for the lack of a driver's license and a poor driving record, but Mr. Cox provided the copy of his driving privileges and license and thus only the matter of his poor record remained. The processing department apparently decided to issue the policy with an increased premium (due to Mr. Cox's driving record).

{¶8} In the meantime, the underwriting department had determined that Mr. Cox was an ineligible risk. On March 4, 2003, the insurance company thus sent the Coxes a written notice of cancellation, advising that their insurance policy would cancel on March 19, 2003 because Mr. Cox was an ineligible risk. Also on March 4, the Coxes paid their increased premium.

{¶9} After receiving this further payment from the Coxes, the insurance company sent a second letter on March 11, 2003, advising them that the payment would not affect the March 19, 2003 scheduled cancellation. The letter noted that only $50.80 of the payment would be retained to satisfy the balance due through March 19 and a check would be issued within 15 days for any overpayment. (The overpayment check was issued on April 14, 2003, four days after the accident.)

{¶10} On March 24, 2003, the BMV returned a copy of the SR-22 to the insurance company and asked the company to correct the highlighted areas as the agent had failed to fill in the blanks for Mr. Cox's name and address; although, the agent did provide Mr. Cox's social security number and date of birth. The insurance company did not make the requested corrections.

{¶11} On April 10, 2003, Mr. Cox traveled left of center on State Route 9 in Belmont County and struck the Bigler vehicle. Brian Bigler, the driver, was killed. Brian's father, Howard Bigler, was injured and so was Mr. Cox. The Coxes demanded coverage after the accident, but the insurance company informed them that the policy had been cancelled as of March 19, 2003. The Biglers' attorney likewise asked the Coxes' insurance company to settle for the full policy limits of $50,000 but was told there was no coverage on the date of the loss.

**{¶12}** The Biglers' own insurance paid them approximately $12,000 for their vehicle and then filed suit against the Coxes for reimbursement. And, on April 1, 2005, Howard Bigler, Jean Bigler, and the Executor of the Estate of Brian Bigler filed a wrongful death and personal injury suit against Mr. Cox, who then filed a third-party complaint against the insurance company, the insurance agency, and the agency's owner, James Boyle Jr. The claim against the latter two parties entailed an allegation that agents informed the Coxes that the policy was still in effect. Kathryn Cox filed an intervening complaint against these third-party defendants since she was also an insured, hers was the only signature on the application, and she owned the vehicle involved in the accident. Cross-claims were filed between the third-party defendants.

**{¶13}** The trial court bifurcated the Bigler complaint from the third-party action. The Bigler complaint was tried to the court on November 20, 2007. In a January 28, 2008 judgment entry, the court entered judgment against Mr. Cox, awarding $1 million to each of the three Bigler plaintiffs. These parties entered an assignment and forbearance agreement that gave the Biglers a portion of any judgment recovered from the insurance company in the Coxes' suit. The Biglers then amended their complaint to include the third-party defendants.

**{¶14}** The insurance company's first motion for summary judgment argued in part that the policy was validly canceled prior to the accident. It was acknowledged that once an SR-22 certificate of insurance is filed with the BMV, the policy cannot be cancelled until 10 days after an SR-26 notice of cancellation is filed in the BMV. It was admitted that no SR-26 notice of cancellation was ever filed with the BMV. However, the insurance company claimed that the BMV rejected the SR-22 because the agent failed to put Mr. Cox's name and address, and thus no SR-22 would have been on file to cancel. The file contains a March 19, 2009 unsigned "opinion" purporting to explain the denial of that request for summary judgment.

**{¶15}** The insurance company's second summary judgment motion, which was not filed until March of 2010, argued that the 2003 policy was void ab initio as the application untruthfully stated that neither driver had a criminal record. The insurance company stated that it had just learned that Mr. Cox had a 1999 felony

conviction for having a weapon under disability (the disability being a 1992 misdemeanor conviction for possession of marijuana). The file contains a June 1, 2010 unsigned "opinion" purporting to explain the denial of that request for summary judgment.

**{¶16}** Thereafter, the Biglers (as assignees of the Coxes) filed a motion for summary judgment, asking in part for the court to find that an SR-22 was filed and thus coverage existed since no SR-26 was filed by the insurance company. They urged that filing was accomplished by bringing the document to the official agency so that it can be accepted by the agency as custodian. They noted that it was undisputed that an SR-22 was provided to the BMV and that the BMV still had that certificate at the time the insurance company issued its notice of cancellation.

**{¶17}** In response, the insurance company stated that the BMV's records, which show prior SR-22s and SR-26s filed on behalf of Mr. Cox, do not show that an SR-22 was filed by this insurance company for Mr. Cox (and instead show the last SR-22 was filed by Globe American Insurance on January 2003). The insurance company urged that the BMV has the right to reject incomplete filings and that the return in this case meant that the SR-22 was never actually filed.

**{¶18}** In a May 3, 2011 judgment entry, the trial court ruled that the delivery of the SR-22 to the BMV by Mr. Cox and the BMV's acceptance of the SR-22 at that time constituted filing within the meaning of the law. The court referenced the purpose of the SR-26 statute as being to protect the motoring public. The court also noted that the certificate of insurance expressed that it would apply until terminated or canceled in accordance with the law. Because the insurance company failed to notify the BMV of the cancellation, the court found that the policy was never properly cancelled. Thus, the court found that the cancellation notice violated the law and the insurance policy. On the basis of the lacking SR-26, the court granted summary judgment against the insurance company and found coverage as a matter of law.

**{¶19}** On January 17, 2012, the jury trial began in the case against the insurance company asserted by the Coxes and the Biglers as assignees [hereinafter jointly referred to as the plaintiffs or the appellees]. (The case against the insurance

agency and its owner had been bifurcated.) The jury awarded $8 million in compensatory damages, $2 million in punitive damages, and reasonable attorneys' fees. The trial court entered judgment stating there was no just reason for delay.

**{¶20}** The insurance company appealed, and this court held the appeal in abeyance, stating that it would serve judicial economy to have the issue of attorneys' fees resolved prior to proceeding in the appeal. The trial court then heard the issue of attorneys' fees. In a July 6, 2012 entry, the court awarded $860,742.50 for the services of one firm and $407,600 for the services of a separate attorney (plus expenses of $53,376 and $16,932). We then reactivated the appeal. The insurance company sets forth twelve assignments of error.

<u>CANCELLATION: ASSIGNMENT OF ERROR NUMBER ONE, PART ONE AND
ASSIGNMENT OF ERROR NUMBER TWO</u>

**{¶21}** We begin by addressing the insurance company's arguments that the cancellation was effective. This topic is addressed in the first part of the first assignment of error and in the second assignment of error, which assignments provide in pertinent part:

**{¶22}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO GRANT SUMMARY JUDGMENT TO PSI BECAUSE THE POLICY WAS CANCELED PRIOR TO THE DATE OF LOSS * * *." (The omitted second part will be discussed separately.)

**{¶23}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING SUMMARY JUDGMENT TO APPELLEES ON THE ISSUE OF COVERAGE AS IT RELATES TO AN SR-22."

**{¶24}** Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Only the listed types of evidence or stipulation may be considered, and said evidence is viewed in the light most favorable to the nonmovant. A summary judgment shall not be rendered unless it

appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can only come to a conclusion in favor of the movant. *Id.*; *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10.

{¶25} The burden of showing that there is no genuine issue of material fact initially falls upon the party who files for summary judgment. *Id.*, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). Thereafter, the nonmovant may not rest upon mere allegations or denials of the party's pleadings but must respond by setting forth specific facts showing that there is a genuine issue for trial. *Id.*, citing Civ.R. 56(E).

{¶26} There are certain statutory limitations on canceling any automobile insurance policy. *See, e.g.,* R.C. 3937.31 (reasons for cancellation); R.C. 3937.32 (written notice of cancellation required; effective date of cancellation shall not be earlier than 30 days following the date of the notice; notice shall contain right to appeal); R.C. 3937.33 (prior to effective date of cancellation, insurer shall tender any refund premium and other sums due). As the insurance company points out, these statutes do not apply to any policy or coverage that has been in effect less than 90 days at the time the notice of cancellation is mailed. R.C. 3937.31(C). The terms of the policy at issue likewise explain that the policy can be canceled within the first 89 days for any reason and may be canceled if the insurance company finds additional violations and accidents on the driver's record.

{¶27} However, there is a special cancellation provision for certified insurance. In general, a person may be required to provide proof of financial responsibility to the BMV in the form of a certificate of insurance as provided in R.C. 4509.46. R.C. 4509.45 (A)(2). Pursuant to R.C. 4509.46:

{¶28} "Proof of financial responsibility may be furnished by *filing* with the registrar of motor vehicles *the written certificate of any insurance carrier* authorized to do business in this state certifying that there is in effect a motor-vehicle liability policy for the benefit of the person to furnish proof of financial responsibility. The certificate either shall state the expiration date of the policy, which date shall be not less than one year from the effective date of the certificate, or if no expiration date is stated in

the certificate, then *such policy shall not expire until canceled or terminated as provided in section 4509.57 of the Revised Code.* The certificate shall also designate by explicit description or by appropriate reference all motor vehicles covered, unless the policy is issued to a person who is not the owner of a motor vehicle." (Emphasis added). R.C. 4509.46.

{¶29} The aforespecified statute for cancellation provides: "When an insurance carrier has certified a motor-vehicle liability policy under section 4509.46 or 4509.47 of the Revised Code, the insurance so certified shall not be canceled or terminated until at least ten days after a notice of cancellation or termination is filed in the office of the registrar of motor vehicles * * *." R.C. 4509.57 (but if an expiration date is stated in the certificate, then no notice of expiration is required). This notice of cancellation under R.C. 4509.57 is commonly called an SR-26, and the certified policy under R.C. 4509.46 is commonly called an SR-22.

{¶30} Here, the SR-22 had no expiration date and instead specifically stated that it would continue until cancelled or terminated in accordance with the financial responsibility law of the state. The insurance company acknowledges that an SR-26 must be filed in order for the cancellation to be effective after an SR-22 has been filed in the BMV. *See Brisker v. Ibrahim*, 20 Ohio App.3d 16, 502 N.E.2d 679 (8th Dist.1985). And, the insurance company admits that the SR-22 was delivered to the BMV and that they did not file an SR-26.

{¶31} The insurance company argues that they were not obligated to file an SR-26 in this case for three main reasons.[1] First, the insurance company urges that because the SR-22 lacked Mr. Cox's name, the SR-22 could not certify that there was a policy in effect "for the benefit of the person" as required by R.C. 4509.46, essentially arguing that lack of the person's name is a statutory defect so that no certificate was actually issued.

---

[1]Appellee posits that the insurance company waived the issue of coverage because at the jury trial on the bad faith claim, the company's representative testified that there was coverage on the date of the accident and they were wrong about the need to file an SR-26. However, this waiver argument is without merit as the trial court made a pretrial legal ruling finding coverage as a matter of law and

{¶32} If this argument had merit, then even in a case where the certificate was never returned by the BMV, the insurer could later raise this defect to avoid coverage where it failed to submit an SR-26 before cancelling an SR-22. The Eighth District has rejected an insurer's argument that it should not be bound by the certificate because of non-statutory formal defects attributable to the insurer itself. *See Brisker*, 20 Ohio App.3d at 18.

{¶33} Here, the SR-22 issued by the insurance company on February 5, 2003 listed Mr. Cox's social security number twice, contained his date of birth, and was personally presented by Mr. Cox in conjunction with his efforts to reobtain his license. And, appellant did obtain his license. The insurance company's agent, who is authorized to sell insurance and to provide SR-22's on the company's behalf, was the person who failed to fill in the space for the insured's name and address. He testified that the social security number was sufficient to identify the person on whose behalf the policy was issued, declaring, "The Social Security number regulates the whole thing." (Gacek Depo. at 66). And, a social security number is more accurate at identification than a name (which can be possessed by multiple individuals). The agent's failure to fill in the blank for the insured's name does not equate with a conclusion that the insurer never even certified that a policy existed "for the benefit of the person" and thus does not equate to a per se lack of certified insurance.

{¶34} Next, the insurance company claims the BMV records show that no SR-22 from this insurance company was considered filed. The insurer points to two October 29, 2010 letters they received from a supervisor at the BMV. One letter states that it is a list of proof of insurance filings in the form of an SR-22 or SR-26 from Globe American Insurance Company. The other letter states that after reviewing the records on Mr. Cox dating from 1996 until the present, no SR-22 or SR-26 was provided from Personal Service Insurance Company (PSI).

{¶35} Pursuant to R.C. 4501.021, the registrar shall determine the methods for obtaining, collecting, recording, and maintaining the records of the BMV pertaining

---

the insurance company was bound by that legal ruling. The representative was only adopting what the court ruled as to coverage in order to defend the bad faith claim.

to drivers' licenses. R.C. 4501.021(A). *See also* R.C. 4501.02(C) (need only keep driver's license application records for four years and all other records for three years). As this is the BMV's function, the insurance company urges that there should be deference to the BMV's determination that no SR-22 was filed.

**{¶36}** If the intent of a statute is clear and unambiguous, we give effect to that expressed intent; if it is not, it can be interpreted. *See Lang v. Director, ODJFS*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 12. The insurance company notes that if a statute's meaning is unclear, the agency's interpretation is entitled to deference if it is based upon a reasonable interpretation of the statute. *See id.* (although dealing with a review of an agency's decision on appeal). Likewise, if a statute provides the authority for an administrative agency to perform a specified act, but does not provide the details by which the act should be performed, the agency is to perform the act in a reasonable manner based upon a reasonable construction of the statutory scheme. *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 287, 750 N.E.2d 130 (2001).

**{¶37}** However, the insurance company presented no evidence of BMV record-keeping procedures in making their initial summary judgment or in responding to appellees' motion for summary judgment. As for the letters referring to Mr. Cox's records, we have two problems. First, the letters show that the insurer asked the BMV for a list of Globe filings and whether there were any PSI filings. It does not appear from these letters that they asked for a list of *all filings*. If PSI filings are listed by another name, then the *narrow* records request made by the insurer here to the BMV would not be dispositive. We are hesitant to assume that filings from PSI were listed under that name at the BMV in 2003.

**{¶38}** We note that another document attached by the insurer shows that Mr. Cox's prior insurer was commonly called Go-America Auto Insurance, but the checks were to be made payable to Globe American Casualty Company. That document's cancellation date aligns to the date of a filing from Globe in the BMV letter. Thus, although the cancellation to the insured prominently displays Go America (and also

contains a name and address for A and A Risk and Rescue), it was the Globe American Insurance Company name recorded by the BMV.

{¶39} We further note that the SR-22 provided to Mr. Cox states, "Personal Service Insurance Co. a subsidiary of Anson B. Smith & Co.", the insurance cards issued to the Coxes stated Boyle Insurance Agency as the agent and then Anson B. Smith & Company as the insurer (with PSI's address) without containing PSI's name, and bills from PSI state "A Guideone Company" under their heading. The naming/filing issues are not a matter of common knowledge and cannot be presumed.

{¶40} In any event, the plaintiffs take issue with the consideration of these BMV letters, urging that they are not proper summary judgment evidence as they were attached to the insurance company's response to summary judgment but were not authenticated. "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). This division also states: "No evidence or stipulation may be considered except as stated in this rule." Civ.R. 56(C).

{¶41} Civ. R 56(E) then states that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Division (E) continues: "Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit." Civ.R. 56(E).

{¶42} "The requirement of Civ.R. 56(E) that sworn or certified copies of all papers referred to in the affidavit be attached is satisfied by attaching the papers to the affidavit, coupled with a statement therein that such copies are true copies and reproductions." *State ex rel. Corrigan v. Seminatore*, 66 Ohio St.2d 459, 467, 423 N.E.2d 105 (1981). "Documents merely attached to a summary judgment motion,

even though allegedly certified as official records, are not cognizable." *Spagnola v. Spagnola*, 7th Dist. No. 07MA178, 2008-Ohio-3087, citing *Spier v. Am. Univ. of the Caribbean*, 3 Ohio App.3d 28, 29, 443 N.E.2d 1021 (1st Dist.1981). *See also Lebron v. A&A Safety, Inc.*, 8th Dist. No. 96976, 2012-Ohio-1637, ¶ 8.

**{¶43}** Here, the letters were signed as in a typical letter and the copies show a BMV Registrar seal was stamped on the letter, but they contain no indication that they were sworn and they were not attached to any affidavit. Thus, the letters from the BMV were not properly authenticated and need not be considered in determining whether the plaintiffs were entitled to summary judgment on the issue of coverage.

**{¶44}** We recognize that a trial court can use its discretion to consider improper summary judgment evidence when no objection is made. *See Spagnola*, 7th Dist. No. 07MA178 at ¶ 39-40. Because Civ.R. 56(C) does not actually speak to a movant's reply, application of this principle is better reserved for cases where the nonmovant fails to object to the movant's failure to authenticate (or where a reply is filed without mentioning the unauthenticated documents in the response). Regardless, the insurer specifically informed the trial court that the plaintiff refused to stipulate to the records. In addition, although the trial court referenced the contents of the letters in its unsigned opinion (which was later incorporated by a signed judgment entry), the court granted summary judgment against the insurance company. For the reasons discussed supra, the letter concerning the lack of an SR-22 from Personal Service Insurance Company (and the letter showing the filings from Globe) need not be taken as summary judgment evidence on the contents or significance of the BMV's records.

**{¶45}** The third major argument presented by the insurance company here is that they had no obligation to file an SR-26 to support the March 19, 2003 effective date of cancellation because the February 5, 2003 SR-22 was not actually filed with BMV due to two undisputed facts: the SR-22 was returned to the insurance company by the BMV (in a letter dated March 24, 2003) for being incomplete due to the lacking name and address and the insurance company never resubmitted the SR-22 to the

BMV. They conclude that the BMV's return to the insurer for correction (more than six weeks after presentation to the BMV) meant that the SR-22 was not filed.

**{¶46}** The cancellation provision in R.C. 4509.57 refers to insurance certified under R.C. 4509.46, which statute states that proof of insurance can be furnished by "filing" a certificate of insurance with the BMV. The parties' arguments here revolve around the interpretation of "filing" and whether this type of return by the BMV means that the certificate was never filed.

**{¶47}** A document is typically considered filed when it is delivered into the official custody and control of the proper agency. *Fulton v. State ex rel. Gen. Motors Corp.*, 130 Ohio St. 494, 200 N.E. 636 (1936) (dealing with a filing to the superintendent of banks). "A paper is filed when it is delivered to the proper official and by him received and filed." *United States v. Lombardo*, 241 U.S. 73, 76, 36 S.Ct. 508, 509, 60 L.Ed. 897 (1916). "In the general sense, filing is actual delivery." *Welsh Dev. Co., Inc. v. Warren Cty. Regional Planning Comm.*, 128 Ohio St.3d 471, 2011-Ohio-1604, 946 N.E.2d 215, ¶ 36. It deals with the act of bringing a paper to an official so that it can be accepted by him as its official custodian. *Id.*, citing *King v. Paylor*, 69 Ohio App. 193, 196, 23 O.O. 594, 43 N.E.2d 313 (1942).

**{¶48}** In terms of court proceedings, a document that is filed but that is not substantively proper or that was not filed in a timely manner does not cease to be a filing merely because it is dismissed; the record of its filing still exists. However, court filings are different than filings in the BMV. It would seem that the BMV has the power to reject insufficient "filings." *See Conley v. OBMV*, Court of Claims No. 2007-06497-AD, 2008-Ohio-4181 (where the driver faxed an illegible copy of his insurance card which contained handwritten notes to the BMV and the BMV rejected it by letter thereafter). However, the BMV did not reject the SR-22 when the insured personally delivered and submitted it in conjunction with obtaining his license. The BMV possessed the form and merely returned it[2] to the insurer for correction and for an

---

[2]There is speculation that a second copy of the SR-22 may have been delivered to the BMV as well because the insurer had an agent's copy and a company copy in their file, suggesting that one of those copies was returned by the BMV rather than the one provided to the BMV by Mr. Cox.

anticipated return back to the BMV. *Compare id.* This return under the following circumstances in this case does not establish that the document was never filed.

**{¶49}** Mr. Cox was informed by the BMV that he had to do certain things to get his license back: one of which was to provide proof of certified insurance. The SR-22 certified that this insurance company issued a policy with a February 5, 2003 effective date. A policy was in fact issued covering Mr. Cox with that same effective date. The certificate assures that it would continue until terminated in accordance with the financial responsibility laws. The SR-22 was delivered to the BMV. The BMV accepted the document and reinstated Mr. Cox's driving privileges. In other words, the insurance company issued a certified policy and allowed its insured to deliver the SR-22 to the BMV to provide proof of insurance (which testimony showed was a regular practice).

**{¶50}** Moreover, the BMV did not generate its letter returning the SR-22 to the insurance company for correction until March 24, 2003 (and did not mail the letter to the insurance company until March 26, 2003). At the time the insurer sent notice of cancellation to the insured on March 4 and at the time of the purported effective cancellation on March 19, the SR-22 had not yet been returned for correction. Yet, the BMV return is the only item relied upon by the insured after the accident when making its determination that they could refuse coverage notwithstanding the lack of an SR-26. At the time they sent the cancellation notice and at the time of the effective cancellation date, the SR-22 was still in the custody of the BMV as it had been for many weeks.

**{¶51}** A contract was entered to certify the existence of insurance until properly canceled, the policy was in fact issued, and thus, it was improper to fail to correct the contractually bargained for SR-22 form and instead misuse the subsequent BMV return to justify a previous failure to provide notice of cancellation to the BMV. Contractually, a personal acceptance of the insured's tender, the issuance of a certified policy, the provision of an SR-22 to the insured for the purpose of receiving his driver's license, and then an eventual return of the SR-22 to the

insurer for mere correction of certain items and for return does not relieve the insurer from its obligations where the insurer agreed to provide that SR-22.

{¶52} And statutorily, there is no indication that the BMV's return of an SR-22 to an insurance company many weeks after accepting it from the insured merely to "correct highlighted areas" eliminates the insurer's obligation to file an SR-26 in order to properly cancel the insurance. Upon such a return (where the certificate was truly issued by the insurer or its agent), the insurer must correct the highlighted areas that its agent omitted, return the SR-22 with the missing information, and simultaneously (or thereafter) file the SR-26 (which would have extended coverage for ten days after its filing due to the premature notice of cancellation provided to the insured).

{¶53} The *Conley* case dealt with a form rejected as illegible due to the insured's copying and faxing and the insured's handwritten notes on it. Here, the insured did not create the filing issue; it was the insurance company's agent that provided an incomplete certificate for presentation to the BMV and then the insurance company's own failure to correct the certificate, even though at the time the certificate had been made, it had promised its insured to provide the certification.

{¶54} In fact and alternatively, we conclude that the application of R.C. 4509.57 does not even depend on the "filing" of an SR-22 with the BMV but rather depends on the act of issuing a certified insurance policy. R.C. 4509.57 provides that a notice of cancellation must be filed with the BMV "when an insurance carrier *has certified* a motor-vehicle liability policy under section 4509.46." (Emphasis added). It does not state, for instance, "when the carrier has certified a policy *and* the certificate has been filed with the BMV."

{¶55} Although R.C. 4509.57 does specifically refer to a policy certified under R.C. 4509.46, the latter statute does not merely pertain to the "filing" of the certificate. It also contains various requirements for the certification, e.g.: written certificate, by an insurance company authorized to do business in the state, certifying there is in effect a motor vehicle liability policy for the benefit of the person who needs to furnish proof of financial responsibility, and containing an expiration date or can be only terminated as required by R.C. 4509.57. *See* R.C. 4509.46. If such a certificate has

been made, the statute states that proof of financial responsibility may be furnished by "filing" that certificate with the BMV. The certificate exists prior to its filing. Thus, an insurance company must file an SR-26 before canceling, even if after issuing notice of cancellation and after the effective cancellation date, the insurer receives from the BMV the SR-22 (which was provided by the insurer's agent to insured for direct submission to the BMV) for correction and the insurer thus later develops a belief that the SR-22 never ended up being accepted for "filing."

{¶56} Support for this proposition is found in the following observations. At the time of this policy, insurance companies regularly gave the insured the SR-22 to bring to the BMV. If an insured waits some time before presenting the certificate to the BMV and the insurance company cancels before he gets there, then under PSI's argument, as long as the insurance company sends notice of cancellation to the insured before the insured makes it to the BMV, it can avoid the SR-26 requirement of R.C. 4509.57. The problem with this is that the BMV may later accept the certificate unaware that it was canceled before the insured presented it. This would defeat the purpose of the statute: to protect the motoring public from the detriments of encountering an uninsured motorist for whom a certified insurance policy was deemed necessary by the state. (The insurer claims that this would no longer happen due to electronic filing; however, this case occurred at a time where insureds were regularly permitted to deliver their SR-22 to the BMV.)

{¶57} Again, the statute does not state, "if an SR-22 is currently on file, then an SR-26 must be filed." Rather, it states that if the insurer has certified a policy under R.C. 4509.46, that insurance shall not be canceled until ten days after a notice of cancellation is filed in the BMV. Thus, if the insurer issued a certified policy to its insured, the insurer is statutorily required to file a cancellation of that policy under R.C. 4509.57 in order to effectively cancel the certified insurance.

{¶58} Either way, an insurer cannot rely on a subsequent BMV return for mere correction in order to retroactively validate a prior cancellation of an SR-22 that occurred without an SR-26. We thus conclude that the trial court did not err in granting summary judgment on the issue of coverage due to the lack of an SR-26.

**{¶59}** The insurer presents some other arguments here about the trial court denying the insurer's request for summary judgment on the appellees' potential alternative paths to coverage due to alleged statements or actions by the insurer or its agent. These arguments need not be addressed as they were presented for our review if we reversed the trial court's decision on the SR-22/SR-26 issue. As the Coxes were covered as a matter of law, their potential alternative arguments for finding coverage, which were never finally ruled upon below, are moot.[3]

<u>VOIDNESS: ASSIGNMENT OF ERROR NUMBER ONE, PART TWO:</u>
<u>ASSIGNMENT OF ERROR NUMBER THREE</u>

**{¶60}** The second part of the insurance company's first assignment of error and the insurance company's third assignment of error, dealing with their defense that the policy is void ab initio due to Mr. Cox's criminal record, provide as follows:

**{¶61}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO GRANT SUMMARY JUDGMENT TO PSI * * * BECAUSE THE INSURANCE WAS VOID AT INCEPTION."

**{¶62}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DEEMING THE TERM 'CRIMINAL RECORD' AMBIGUOUS WITHOUT ASCRIBING ANY MEANING TO THAT TERM AND THEN REFUSING TO ALLOW THE JURY TO DECIDE THE PURPORTED AMBIGUITY."

**{¶63}** The policy was issued and the accident occurred in 2003. Claims to the insurance company were made in 2003 and thereafter. This suit was filed in 2005. The insurance company filed a motion for summary judgment on the SR-26 in December 2007. It was not until March of 2010 that the insurance company asked for summary judgment on the grounds that the February 5, 2003 policy was void ab initio. The insurance company stated that it discovered that Mr. Cox had a felony conviction for having a weapon under disability, the disability being possession of

---

[3]We note that these issues were essentially mooted at the trial court level as well by the trial court's finding of coverage due to the SR-22/SR-26 issue. In that May 3, 2011 entry, the court overruled the branch of the plaintiffs' motion for summary judgment dealing with alternative paths to coverage. Any denial of the insurer's motion for summary judgment on these grounds filed years prior was interlocutory and then became moot after the court found coverage on the SR-22/SR-26. We also note that a March 19, 2009 "opinion" denying the insurer's motion was not signed, and thus, it is not a judgment entry which can be reviewed. *See* Civ.R. 59(A)-(B).

marijuana. The application for insurance was filled out by the agent and signed by Mrs. Cox. Question 12 asked, "Does any driver have a criminal record?" The circled answer was, "No."

**{¶64}** The insurance company urged that this misrepresentation was a breach of warranty rendering the policy void from the inception which would mean that there was no coverage and thus there could be no bad faith claim. The insurance company relied on the language in the policy incorporating the application and stating that they can void the policy for knowingly concealing or misrepresenting any material fact "including, but not limited to material misrepresentations regarding * * * [and then listing certain items in the application without listing criminal record]" or engaging in fraudulent conduct at the time the application was made.

**{¶65}** A material fraudulent misrepresentation can render the policy voidable only prior to a claim, whereas, if the misstatement is a breach of warranty, it can void the policy ab initio. *Allstate Ins. Co. v. Boggs*, 27 Ohio St.2d 216, 218-219, 221, 271 N.E.2d 855 (1971). The insurer contends that the answer to the criminal record question was a breach of warranty rather than a mere fraudulent misrepresentation. The insurer points out that the language in the policy before us has been reviewed by the Fourth District and found sufficient to allow the policy to be voided due to the failure to disclose the insured's criminal history. *See Personal Serv. Ins. Co. v Lester*, 4th Dist. No. 06CA12, 2006-Ohio-5199, ¶16 (where PSI learned of the insured's prior criminal history soon after the 2003 accident).

**{¶66}** The plaintiffs attempt to distinguish the Fourth District's *Lester* case, stating that the trial court here considered an argument not addressed in *Lester* (whether "criminal record" is ambiguous) and stating that the agency knew Mr. Cox had a criminal record as that agency had bonded him out of jail in the past. The plaintiffs then disagree with the *Lester* holding, urging that *Boggs* requires the warranty language to specifically state that it applies to the criminal record question. They also assert that the trial court was not required to permit the insurance company to raise the voidness doctrine *for the first time* in a March 2010 summary judgment motion where the application and accident took place in the beginning of 2003,

demands were made soon thereafter, and the complaint was filed in the spring of 2005.

{¶67} Pursuant to Civ.R. 8(C), an answer shall set forth affirmatively any matter constituting an avoidance or affirmative defense including fraud. Here, the answer did not mention voidness, breach of warranty, or fraud; nor can we read the answer's contents as encompassing such doctrines. *See Mumaw v. W.&S. Life Ins. Co.*, 97 Ohio St.1, 9-11, 119 N.E.2d 132 (1917) (condition precedent is distinct from breach of warranty); *McCabe/Marra Co. v. Dover*, 100 Ohio App.3d 139, 147, 652 N.E.2d 236 (8th Dist.1995) ("the defense of invalidity of contract or that the contract was void ab initio constitutes an affirmative defense that must be set forth in the pleadings.").

{¶68} After the initial twenty-eight days of filing the answer, a party may amend it only with the opposing party's written consent or the court's leave. Civ.R. 15(A). Although the rule provides that the court shall freely give leave when justice so requires, seven years had passed since the date of the accident, and even then, the insurance company only learned of the criminal record from the court mentioning it in passing, apparently in anticipation of evidentiary issues which could arise if Mr. Cox testified. The insurance company did not specifically seek leave to amend the answer, and this issue raised in the 2010 summary judgment motion could reasonably be overruled due to the inordinate delay and lack of attempt to discover Mr. Cox's criminal history. (We note here that this same insurance company voided the policy in *Lester* after discovering that driver's criminal record soon after a 2003 accident, the same year as the accident in this case.)

{¶69} In any event, as appellees point out, there is a special statute applicable to certified coverage which trumps the general voidness defense. Pursuant to the version of R.C. 4509.53 in effect at the time:

{¶70} "Every motor-vehicle liability policy is subject to the following provisions which need not be contained therein:

{¶71} (A) *The liability of the insurance carrier with respect to the insurance required by sections 4509.01 to 4509.78, inclusive, of the Revised Code, shall*

*become absolute whenever injury or damage covered by the policy occurs*; the policy shall not be canceled or annulled as to such liability by any agreement between the insurance carrier and the insured after the occurrence of the injury; *no statement made by the insured or on his behalf and no violation of the policy shall defeat or void the policy.*" (Emphasis added). R.C. 4509.53(A).

**{¶72}** The effect of this statute is clear: the liability under the policy was fixed at the time of the injury, and a certified policy cannot be declared void ab initio based upon misstatement in the application. The insurance company's void ab initio argument fails due to this statute.[4]

**{¶73}** Finally, we note that the insurer argues that the trial court erred in stating that the phrase "criminal record" in the application was ambiguous so that the insurer could not void the policy on the basis of Mr. Cox's criminal record. Once again, we point out that the March 19, 2009 filing labeled an "opinion" was not signed by the court. We notice that the trial court did say on the record that it already held that "criminal record" was ambiguous so the voidness doctrine cannot be used by the insurer. (Tr. 11-12). Nevertheless, the court granted summary judgment to the plaintiffs on the issue of the SR-22/SR-26, the voidness doctrine cannot be used due to R.C. 4509.53(A), and voidness was not raised in the answer and was then untimely raised seven years after the accident. Any error by the trial court in finding the phrase "criminal record" to be ambiguous is without effect and irrelevant.

ASSIGNMENT OF ERROR NUMBER FOUR

**{¶74}** Appellant's fourth assignment of error provides:

**{¶75}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PREVENTING PSI FROM INTRODUCING EVIDENCE OF MR. COX'S PRIOR

---

[4]Although this topic was covered in appellees' brief, the insurance company's reply brief did not respond to this topic, nor did they contest the premise at oral argument where it was also presented. It thus seems their voidness argument was only presented in case we agreed with their SR-22/SR-26 argument. We also note that the trial court's "opinion" denying the insurer's summary judgment request to rule the policy was void was never signed by the trial court. And, because the trial court later granted summary judgment for the plaintiffs on the SR-22 issue, any prior interlocutory voidness decision became moot as the doctrine could no longer be considered and any interlocutory denial of summary judgment never became final because summary judgment was granted to the other party on a threshold issue.

CRIMINAL RECORD AS REBUTTAL TESTIMONY TO THE EXTREME AND UNFAIR PREJUDICE OF PSI."

**{¶76}** The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Thus, we only reverse for an abuse of discretion, which is characterized by a ruling that lacks a sound reasoning process. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14.

**{¶77}** In conducting this deferential review, an appellate court cannot find an abuse of discretion merely because the appellate court would not have reached the same conclusion or is less persuaded by the trial court's reasoning process than by the countervailing arguments. *Id.* Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice. *Beard v. Meridian Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 20; Civ.R. 61.

**{¶78}** The insurance company states that it should have been permitted to introduce Mr. Cox's criminal record in the cross-examination of Mrs. Cox. Mrs. Cox was asked on direct examination how it made her feel when she was told she was not covered after the accident. She responded that it made her angry and explained: "we did the application process. We paid the money. They wanted more money because they said it was higher risk, maybe, than they anticipated. So we paid them more money. There was so many modes of correspondence back and forth. It was difficult to keep track of it. But I did everything they asked and instructed me to do. I was floored when there was no coverage for the accident." (Tr. 781-782).

**{¶79}** Prior to cross-examining Mrs. Cox, the insurance company's attorney informed the court that she would like to ask Mrs. Cox about the failure to disclose Mr. Cox's criminal conviction on the application, noting that Mr. Cox was indicted for the weapons offense the month they were married and was convicted and incarcerated for six months after they were married. (Tr. 787, 789). Counsel recognized that the court had already ruled the conviction would not be a basis for voiding this policy and explained that this was not the purpose of its introduction. (Tr.

787). Counsel urged that the conviction went to the heart of credibility, paraphrasing Mrs. Cox as saying they did everything they could and urging that the conviction showed that such was not the case. (Tr. 787).

**{¶80}** It was pointed out that coverage has already been ruled to exist as a matter of law, that the only matter before the jury was bad faith denial of coverage, and that the insurance company did not rely upon the conviction in canceling the policy or in denying coverage thereafter. (Tr. 788, 792). The plaintiffs urged that the introduction of Mr. Cox's conviction in conjunction with the application and policy would unfairly suggest to the jury that there was no coverage. (Tr. 788). The plaintiffs posited that the insurance company wanted to introduce Mr. Cox's prior conviction to make him look like a bad person. (Tr. 792). The plaintiffs asserted that they did not open the door to the conviction and concluded that the conviction was more prejudicial than probative. (Tr. 791). The court noted that this was not a crime of this witness and concluded that the introduction of the conviction during her testimony would be more prejudicial than probative. (Tr. 794).

**{¶81}** On appeal, the insurer argues that the conviction was admissible as rebuttal testimony and to show that she did not have clean hands due to misrepresentation, which they urge is a defense to the bad faith action. The plaintiffs initially respond that the insurance company is now utilizing different arguments than those presented below, claiming that only impeachment and credibility were raised to the trial court.

**{¶82}** A party cannot raise one legal theory for admission of evidence below and appeal on a different theory. *See, e.g., State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 33; *State v. York*, 115 Ohio App.3d 245, 249, 685 N.E.2d 261 (1996). Thus, when a party raises one specific theory in support of admission of evidence below, he waives on appeal the theories not raised. *State v. Nichols*, 7th Dist. No.07JE50, 2009-Ohio-1027.

**{¶83}** As to a misrepresentation defense to the bad faith action, the insurer did not argue during the discussion of Mrs. Cox's cross-examination that exclusion of the conviction would preclude it from presenting an affirmative defense. Rather, the

insurer stated that she claimed they did all they could and that credibility is always an issue. The insurer did mention, "good faith runs on both sides." But then immediately stated, "And it goes strictly to credibility." (Tr. 793).

{¶84} In any event, the insurer's brief only cursorily reviews this topic, stating that "consideration should be given to the fact that an insurer is entitled to present the affirmative defense or concealment or misrepresentation." However, the criminal history was not the basis for the increased premiums, the subsequent cancellation, or the refusal to defend or pay under the policy.

{¶85} The reasonable justification aspect of bad faith refusal to pay deals with a genuine dispute over the status of the law at the time of the denial or the facts upon which the claim is based. *See* Ohio Jury Instructions, CV 709.65 (3). The portion of this uniform instruction cited by the insurer company's brief deals with concealment or misrepresentation of a material fact or circumstances *relating to the insurer's investigation of the insurance claim. See* Ohio Jury Instructions, CV 709.65 (9)(B). There was no allegation that there was concealment or misrepresentation after the event giving rise to the claim relating to the insurance company's investigation of that event. Thus, the insurance company's argument is based upon inapplicable law.

{¶86} As to the rebuttal theory, the insurer argued at the proper place below that Mrs. Cox said: "We did everything we could. We disclosed everything to the agent. And that in fact was not the case." (Tr. 787). In fact, the plaintiffs responded below that they did not open the door to the conviction. (Tr. 791). Thus, contrary to the plaintiffs' assertion, this theory was raised at the proper place at trial below.

{¶87} "Facts contradicting a witness's testimony may be shown for the purpose of impeaching the witness's testimony." Evid.R. 616(C). But, if offered solely to impeach, extrinsic evidence of contradiction is inadmissible unless the evidence is permitted by other listed rules such as 608(A) or permitted by the common law of impeachment and not in conflict with the Rules of Evidence. *Id.* Just because the plaintiff's credibility as to her feelings and damages is important, does not mean that the defense can place before the jury extrinsic evidence of an example of an alleged prior assent to a misrepresentation. *See* Evid.R. 608(B). Still,

questioning on the matter can proceed, in the court's discretion, if clearly probative of untruthfulness. See *id.* The insurer does not cite either of these rules.

**{¶88}** In explaining its rebuttal justification for introducing the conviction, the insurer sets forth the following quote from this court: "Rebutting evidence is that which is given to explain, repel, counteract, or disprove facts given in evidence by the adverse party. It is that evidence which has become relevant or important only as an effect of some evidence introduced by the other side." *Weimer v. Anzevino*, 122 Ohio App.3d 720, 726, 702 N.E.2d 940 (7th Dist.1997), quoting *Nickey v. Brown*, 7 Ohio App.3d 32, 35, 454 N.E.2d 177, 181 (9th Dist.1982). The insurer's argument is essentially based upon a witness on direct examination "opening the door" to an otherwise prohibited topic.

**{¶89}** However, contrary to defense counsel's paraphrasing (at page 787) of Mrs. Cox's testimony used to support the rebuttal argument before the trial court, Mrs. Cox did *not* testify: "We disclosed everything to the agent." As set forth above, her statement referencing the application was: "we did the application process. We paid the money. They wanted more money because they said it was higher risk, maybe, than they anticipated. So we paid them more money. There was so many modes of correspondence back and forth. It was difficult to keep track of it. But I did everything they asked and instructed me to do. I was floored when there was no coverage for the accident." (Tr. 781-782).

**{¶90}** Thus, part of the insurer's argument below was unsupported by the actual testimony presented. And, her reference to doing what the insurer asked can be read as referring to her response to all of the correspondence and issues that arose after the initial payment. The statement alleged to have opened a door should be specifically related to the item sought to be introduced. *See Westinghouse Elec. Corp. v. Dolly Madison Leasing & Furniture Corp.*, 42 Ohio St.2d 122, 130-131, 326 N.E.2d 651 (1975). Mrs. Cox did not refer to her character or Mr. Cox's character or her truthfulness on the application. It was within the trial court's discretion to find that Mrs. Cox's testimony did not open the door to Mr. Cox's criminal history.

**{¶91}** And, it was reasonable for the trial court to find that, even if it was relevant and the door was opened, it should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. *See* Evid.R. 403(A). The trial court could have been concerned that the jury would question the issue of coverage, which was already determined. Furthermore, the trial was taking place on the issue of bad faith denial of coverage, and the felony conviction had nothing to do with that denial. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FIVE

**{¶92}** Appellant's fifth assignment of error contends:

**{¶93}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PREVENTING PSI FROM INTRODUCING EVIDENCE OF THE COXES' PRIOR FORECLOSURE ACTION."

**{¶94}** Mrs. Cox testified about various financial consequences as a result of the accident and the lack of insurance coverage. She stated that she could not keep up with her mortgage payment and ended up losing her home. She testified that she moved herself and three children into her mother's basement while Mr. Cox went to live with his brother because his injuries made him difficult to care for and they ended up getting divorced because it was all too much. (Tr. 768). She stated that she was ashamed and humiliated. Her attorney noted that the Biglers sued her in September of 2003 and asked if she had ever been sued in her life before that, to which she answered, "No." (Tr. 759).

**{¶95}** The insurance company claims that this testimony was pivotal in obtaining the substantial jury verdict. The insurance company tried to introduce an exhibit showing that a complaint in foreclosure had been filed against Mrs. Cox prior to the accident. The plaintiffs objected arguing that they never saw the document before, and that it does not show that she had knowledge of the foreclosure suit. (Tr. 840-841). The defense stated that they also had the docket showing that she filed an answer. (Tr. 841-842). The plaintiff argued that said fact was not contained in the exhibit presented. (Tr. 842). Plaintiffs' counsel added that merely because a

foreclosure action is filed before the accident does not mean that it could not have been the accident that caused her to lose the house because foreclosure defendants can redeem and prevent the foreclosure.

{¶96} The court expressed concern that the issue could lead to a trial within a trial. (Tr. 843). The court sustained the objection but only in part. The court permitted the defense to ask Mrs. Cox if they had financial problems or proceedings brought against them before the insurance company's denial of her claim but instructed counsel not to use the word foreclosure. (Tr. 841-842).

{¶97} The defense then asked Mrs. Cox if she had financial problems relating to her house prior to the accident. She admitted that she did and said that she had been making payments but the mortgage company was returning her payments and she was having a dispute with the mortgage company. (Tr. 844). *The defense never asked if proceedings had been filed against her as a result of those problems as the court allowed.*

{¶98} The insured cites no law here and proceeds under the open door theory, stating that it goes to her credibility and to the substance of her damages claim. That is, by stating she had never been sued prior to this lawsuit in the context of claiming that the denial of coverage caused her to lose her house, she opened the door to a question regarding a prior foreclosure action that was filed before the accident.

{¶99} Even if the court's instruction to avoid the word foreclosure was unwarranted, the insurer failed to ask the permitted question on the existence of *prior proceedings brought against them*. Had they asked the permitted question, she may have testified that the bank had filed a foreclosure action against her prior to the accident. The lack of exploration under the parameters set by the court precludes the raising of a desire to go outside of those parameters under the circumstances herein. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER SIX

{¶100} Appellant's sixth assignment of error provides:

{¶101} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PREVENTING PSI'S DEFENSE COUNSEL FROM RAISING A NEGATIVE INFERENCE ABOUT DONALD COX'S FAILURE TO TESTIFY."

{¶102} Counsel should be afforded great latitude in closing argument. *Pesek v. University Neurologists Assn., Inc.*, 87 Ohio St.3d 495, 501, 721 N.E.2d 1011 (2000). The evaluation of the permissible bounds of argument in a case is initially a discretionary function of the trial court. *Id.* Hence, a reviewing court does not reverse a decision limiting closing argument unless there has been an abuse of discretion. *Id.*

{¶103} During closing arguments, defense counsel stated that many witnesses testified on the stand and some testified by deposition. Counsel then stated: "Well, the question: Where is Donald Cox?" An objection was entered, and the court sustained the objection, ruling: "That's not necessary that his presence or absence is not something that the jury should be taking into account." (Tr. 1283).

{¶104} The insurance company states that the court should not have precluded it from commenting on the absence of Mr. Cox at trial, stating that courts have long held that counsel can comment upon a party's failure to take the stand. The plaintiffs respond by emphasizing that those courts actually held that "under some circumstances" such comment can occur. The plaintiffs suggest that the insurer could have introduced Mr. Cox's deposition or subpoenaed him. *See Sotos v. Edel*, 10th Dist. No. 02AP-1273, 2003-Ohio-6471, ¶ 103 (stating that apparently both sides felt that, as a matter of trial strategy, the injured party should not be asked to testify and that "under the circumstances of this case," no inference can be reasonably drawn from the failure to testify that she did not suffer pain as a result of the accident). The plaintiffs urge that the court's ruling was not an abuse of discretion, pointing out that Mr. Cox's brain injury was part of the record.

{¶105} We begin by noting that Ohio's constitution provides: "No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel." Ohio Constitution, Art. I., Sec. 10. *See also* R.C. 2945.43. Since a

criminal defendant's failure to testify could be the subject of comment in closing, it was reasoned that a civil party's failure to testify was also a proper subject of comment. *State ex rel. Johnson v. Mooney*, 171 N.E.2d 918, 920 (8th Dist.1961), ("under some circumstances").

{¶106} Thereafter, the United States Supreme Court ruled that comment on a criminal defendant's failure to testify violates the Fifth Amendment. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The Court later explained that this ruling does not affect the ability to make adverse inferences against parties in a civil action when they refuse to testify in response to probative evidence offered against them. *Baxter v. Palmigiano* (1976), 425 U.S. 308, 318-319, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (silence is often evidence of the most persuasive character).

{¶107} As the insurer urges, Ohio courts regularly hold that the failure of a party to testify in a civil action may be a proper subject of comment to the jury. *See, e.g., Hess v. Norfolk S. Ry. Co.,* 153 Ohio App.3d 565, 2003-Ohio-4172, 795 N.E.2d 91, ¶ 78 (8th Dist.); *Ohio Turnpike Comm. v. Likowski,* 9th Dist. No. 21097, 2002-Ohio-7322, ¶ 16; *Whitlach & Co. v. Stern*, 9th Dist. No. 15345 (Aug. 19, 1992); *Glanton v. American Mot. Ins. Co.*, 8th Dist. No. 56323 (Dec. 21, 1989); *Smith v. Lautensleger*, 15 Ohio App.2d 212, 214, 240 N.E.2d 109 (1st Dist.1968)*; Johnson*, 171 N.E.2d at 920, citing *Diffenbacher v. Lakeshore Coach Co.*, 81 N.E.2d 337, 338-339 (8th Dist.1948). *See also Burke v. Schaffner*, 114 Ohio App.3d 655, 665-666, 683 N.E.2d 861 (10th Dist.1996).

{¶108} The First District has explained: "The historic rights to comment to the jury upon the conduct of parties is fundamental in our system of adversary trial." *Smith*, 15 Ohio App.2d at 214. That court declared that to "adopt a rule prohibiting comment on the failure of a party to a civil action to testify as to matters which he can reasonably be expected to deny or explain because of facts within his knowledge, * * * would do unconscionable violence to the system which has functioned so admirably to search out the truth in a legion of cases." *Id.*

{¶109} However, the rule announced in most of those cases is that the failure to testify "may" be the proper subject of comment, not "is" the proper subject of comment. As the plaintiffs point out, courts often qualify the rule about commenting on a parties' failure to testify by adding the caveat "under some circumstances." *Johnson*, 171 N.E.2d at 920; *Diffenbacher*, 81 N.E.2d at 338-339. *See also Cunningham v. Hildebrand*, 142 Ohio App.3d 218, 231 755 N.E.2d 384 (8th Dist.2001) (allowing court to instruct jury that they are not to draw inference from defendants' failure to testify on direct examination); *Cincinnati Traction Co. v. Reis*, 17 Ohio App. 198 (1st Dist.1922), citing Wigmore on Evidence, Sec. 285 (inferences can be made except upon certain conditions and are open to explanation that a different hypothesis is more natural than a party's fear of exposure).

{¶110} The Ohio Supreme Court has explained this statement in Wigmore on Evidence, noting that an argument before the Court originated from the theory that the failure to produce evidence which a fearless claimant would naturally produce, allows an inference that the evidence by the claimant would be unfavorable. *Silveous v. Rensch*, 20 Ohio St.2d 82, 84, 253 N.E.2d 758 (1969). The Court held that a jury instruction stating that an adverse inference may arise where a party fails without satisfactory explanation to call a known witness under the litigant's control where the litigant's interest would naturally be served by production of that witness is error where jury is not also instructed regarding facts to be considered in determining what evidence a litigant would naturally produce at trial. *Id.* That case thus suggests that the Court follows a rule that the inference arises under some circumstances and not in every case.

{¶111} Here, the fact that Mr. Cox suffered a brain injury is on the record: the insurer mentioned the injury in opening statements, explaining that Mr. Cox has brain damage and that his memory is not good; Mr. Blass testified that the combination of the brain injury and being upset over the wreck makes it difficult for Mr. Cox to talk about the insurer's denial of coverage; defense counsel later asked Mr. Blass, "And I understand Donald Cox has suffered a brain injury from the accident, and his memory is spotty, correct?"; and Mrs. Cox testified that it was difficult for Mr. Cox to

process his thoughts, he would get easily confused, and he would forget things and become angry. (Tr. 329, 440-441, 511, 770).

{¶112} Thus, the record discloses some explanation of Mr. Cox's failure to testify, an explanation related to the accident which is the genesis of this case. *Compare Morrison v. Morrison*, 99 Ohio App. 203, 207, 132 N.E.2d 233 (6th Dist.1965) (where record discloses no explanation of the plaintiff's failure to testify, an inference arises that the plaintiff's testimony would have been unfavorable). A rational trial court could find that the situation here fell within the exception created by the cases stating that comment on the failure to testify may be proper "under some circumstances." *See, e.g., Johnson*, 171 N.E.2d at 920; *Diffenbacher*, 81 N.E.2d at 338-339; *Cincinnati Traction*, 17 Ohio App. 198. *See also Cunningham*, 142 Ohio App.3d at 231 (allowing court to instruct jury that they are not to draw inference from defendants' failure to testify on direct examination).

{¶113} Even the First District qualifies its strong language in *Smith* with: "reasonably be expected to deny or explain because of facts within his knowledge." *Smith*, 15 Ohio App.2d at 214. Here, the trial court could have rationally decided that Mr. Cox could not be reasonably expected to deny or explain facts within his knowledge based upon his brain injury that caused memory issues and that most facts were presented by others such as experts on insurance law, the attorney involved in trying to get the insurance company to provide coverage, and Mrs. Cox.

{¶114} Under the particular facts and circumstances of this case, we cannot say that the trial court abused its discretion in ruling as it did here. And, even assuming arguendo the trial court should have allowed the comment in closing, the ruling was not outcome determinative. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER SEVEN</u>

{¶115} The insurance company's seventh assignment of error provides:

{¶116} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PREVENTING THE DEFENSE EXPERT FROM TESTIFYING FULLY ABOUT HIS OPINION REGARDING PSI'S REASONABLE JUSTIFICATION."

**{¶117}** An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 555, 644 N.E.2d 397 (1994) (need not show actual intent). The jury was instructed as such and informed that the insurer's action is without reasonable justification when there is no lawful basis or a failure to determine whether there was any lawful basis for the action, noting that this entails a determination of whether there was a reasonable basis in law or fact for the insurer's refusal. *See* Ohio Jury Instruction 709.65. *See also Tokles & Son Inc. v. Midwestern Indemity Co.*, 65 Ohio St.3d 621, 630, 605 N.E.2d 936 (1992) (examine whether the claim "was fairly debatable" and whether "the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim").

**{¶118}** Under this assignment of error, the insurance company contends that the court improperly limited its expert's testimony on the insurer's reasonable justification in denying the claim. The insurer states that its expert was not permitted to describe the law the insurer would have considered in reviewing the claim in order to address issues raised by the plaintiffs' expert and that its expert was cut off when attempting to explain why the evaluation of the SR-22 issue was reasonably justified.

**{¶119}** The plaintiffs generally respond that the trial court permitted a full and robust defense on reasonable justification and that the expert was not reprimanded for explaining why the SR-22 evaluation was reasonable. Rather, the plaintiffs characterize the ruling as proper because it was appropriate to prevent an expert from directly contradicting the trial court's ruling (and the insurer's admission[5]).

**{¶120}** The insurer's expert began testifying about the statutes dealing with premium refunds and an appeal to the superintendent of insurance. (Tr. 1089-1090). When he started citing specific statutes, the plaintiffs objected. The court stated that the expert could not instruct the jury on how it all works as that is to come from the

---

[5]As to the suggestion of an admission, the insurer's representative testified that based on his experience, when the BMV returns the SR-22 for missing information, there is no effective filing until they send it back completed, that he was wrong, and that he did not know he was wrong at the time. (Tr. 930). This was merely the recognition of the trial court's pretrial ruling. *See* fn.1 supra.

court but said that he could go a bit further. The defense seemed to agree twice with the court's initial ruling. (Tr. 1091).

{¶121} The expert continued to speak of specific statutes. For instance, he stated that R.C. 3937.31 deals with policy periods and grounds for cancellation. He stated that R.C. 3937.39 states that R.C. 3937.30 through 3937.39 do not apply to any policy that has been in effect less than 90 days at the time of cancellation. (Tr. 1091-1092). He disclosed that the time to return a refund regulation and the appeal to the superintendent provision do not apply to a policy that is cancelled within the first 89 days. Then, he stated, "The cancellation procedures that are in the regulation don't apply to that, because they're all within this 3937.30 to 3937.39." (Tr. 1092).

{¶122} The plaintiff objected, and the court sustained the objection. The court stated that its ruling went far beyond what the expert was advising and the expert's statement could only be confusing. (Tr. 1092-1093). The court instructed the jury to ignore the answer. The court also stated that said law was "frankly not pertinent to what's happened here." (Tr. 1093).

{¶123} This ruling is not an abuse of discretion. The expert testimony was getting confusing as he cited specific statutes and he was referring to cancellation procedures in general, which the jury could have interpreted as including the SR-26 issue. However, that issue is contained in a different Chapter, which does not exclude policies in the first 89 days from its requirements.

{¶124} Defense counsel then moved on, asking the expert to remember that the court already ruled that there was coverage as the notice of cancellation was ineffective, to take that ruling into account in answering, and to focus on the issue of whether the denial of coverage was reasonable. (Tr. 1093). The expert then reiterated three times that the appeal process does not apply within the first 89 days. (Tr. 1097-1098). Thereafter, defense counsel asked the significance of the BMV letter "keeping in mind the Court's ruling that the SR-22 was legally filed and the cancellation was effective." The expert testified that the BMV letter caused the insurer to assume that an SR-22 had not been filed because it did not have the proper information and they thus felt that an SR-26 was not required. (Tr. 1106). He

explained that if no SR-22 had been filed, then there would be no reason to file an SR-26 "because if you sent it to the BMV, it would not line up with anything." (Tr. 1107).

**{¶125}** The expert was then precluded from opining on the "reasonableness" of the denial of coverage on the grounds that it was an ultimate issue for the jury. (Tr. 1109). When the defense pointed out that the plaintiffs' experts opined that the denial was unreasonable, the plaintiffs responded that they only asked if the conduct complied with industry standards (at pages 617-620). (Tr. 1109, 1117).

**{¶126}** The insurer's expert then concluded that he believed the insurer's denial was in conformity with industry standards. He continued: "I believe that they had a reasonable -- with the information they had at hand when they formed the opinion and made the cancellation and had the return from the SR -- the SR-22 from the State, at that point, they did not necessarily need to respond to that with an SR-26. I understand the Court has ruled that they were wrong in that." (Tr. 1110).

**{¶127}** The court then stated, "The law in the state of Ohio is that the SR-26 needed to be filed. So it's not something that I have created. This is the law." (Tr. 1110). The expert then testified, "I'm talking about the reasonableness of what they -- when they were looking at it. Okay. And that's -- that's an opinion. You can be wrong on something without being in bad faith." The plaintiff again objected. The court agreed that it is an ultimate decision for the jury and it is not a subject for expert testimony, but refused to strike the statement and instead instructed the jury that it was something they will hear argued but it is for them alone to decide. (Tr. 1111).

**{¶128}** Pursuant to Evid.R. 703, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Thus, the expert's opinion (that the insurer's position regarding the effectiveness of its cancellation) was not excludable merely because it was on an ultimate issue.

**{¶129}** Even though testimony on an ultimate issue to be decided by the jury is not per se inadmissible, it is within the trial court's sound discretion to refuse to admit the testimony of an expert witness on an ultimate issue where such testimony

is not essential to the jury's understanding of the issue and the jury is capable of coming to a correct conclusion without it. *Bostic v. Connor*, 37 Ohio St.3d 144, 148-149 524 N.E.2d 881 (1988) (jury did not require expert on employee or independent contractor). We note that the insurer sets forth no law in support here (besides the general law that bad faith is a lack of reasonable justification); they do not even cite to Evid.R. 703.

{¶130} We conclude that the trial court's limitation on the expert was within its discretion. The statement to the jury that the issue was ultimately for them alone was not incorrect. The expert's statement that you can be wrong about something without acting in bad faith was more of an argument or a statement of law than a helpful expert opinion. We note that the court did not strike the answer. Thus, the jury still got to hear it and the statement regarding the SR-26. The court could properly ensure that the expert did not testify that the court made an erroneous legal ruling. Additionally, although he was not permitted to specifically opine that the denial was reasonable, he was permitted to testify that he believed that the denial was in conformity with industry standards. (Tr. 1109-1110). This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER EIGHT

{¶131} The insurance company's eighth assignment of error provides:

{¶132} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY RECITING 26 PARAGRAPHS OF ALLEGED FACTS IN THE JURY INSTRUCTIONS OVER THE OBJECTION OF DEFENSE COUNSEL."

{¶133} The insurance company contends that twenty-four numbered statements in the jury instructions under the heading: "Plaintiffs rely upon the following:" was an improper recitation of unstipulated facts. The insurer posits that the court can only instruct on the law and states that it preserved this issue in a written objection to the proposed instructions and orally at trial.

{¶134} The plaintiffs initially suggest that a specific objection was not made. "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict,

*stating specifically the matter objected to and the grounds of the objection.*" (Emphasis added.)  Civ.R. 51(A).

{¶135} As to the written objection, the insurer merely crossed through the paragraphs and wrote "object to all."  Thereafter, during the discussion of the instructions, the insurance company voiced objection to the recitation of the facts, specifying, "*the jury should decide the facts in this case and* we disagree with the manner in which the paragraphs or the wording of the particular paragraphs, that *the insertion of those are basically telling the jury what they're supposed to accept in terms of the facts of this case.*  And--."  (Emphasis added.)  (Tr. 1192).

{¶136} This is not merely a vague objection to the wording of the paragraphs.  Rather, it sufficiently voiced a separate objection to the existence of the factual recitation in the instruction and the encroachment on the jury's role as the fact-finder (and also raises the issue of wording).

{¶137} Plaintiffs also urge that the insurer's in-depth participation in the redrafting of the wording and the court's agreement to most of the insurer's suggested changes eliminated any prior objection that the facts should never have been given.  Yet, where a court overrules a threshold objection that facts should not be given, a party can then participate in the drafting of those facts to make them more accurate without waiving the initial objection.

{¶138} Still, while defense counsel was objecting, it appears something happened to the recording device (as it had just minutes prior while discussing a different topic) because the next statement is the court saying, "Okay.  Now we're on.  You're fine until we get to the point where the Court advises * * *."  (Tr. 1193).  The court and defense counsel then went on to discuss the wording of each portion of the factual recitation that the insurer wanted changed, and the court made many of the requested changes.  (Tr. 1193-1209).

{¶139} With the break in the record, we do not know what other statements were made by the defense or the court.  It is possible that the trial court explained the efficiency of providing the outline of undisputed facts and dates, and the defense agreed and then just contested the wording.  The content of that break in the record

was the responsibility of appellant to recreate. *See* App.R. 9(B)(1), (4), (C). Still, the effect of a missing portion of the record is a presumption of regularity, and we are hesitant to presume the insurer withdrew their objection to the court's presentation of a factual recitation in the first instance.

{¶140} Next, we note that some of the paragraphs in the disputed recitation cannot be contested under this assignment as they represent the law in the case as determined by the trial court at pretrial. For instance, one paragraph stated that delivery of the SR-22 to the BMV and its acceptance constituted filing within the meaning of the law. Another paragraph provided that under Ohio law, once a policy has been certified by an insurer it cannot be cancelled until notice of cancellation is given to the BMV. The subsequent paragraph stated that the insurer did not provide notice to the BMV. And, the next paragraph provided that because the cancellation did not comply with the law, the court ruled that the policy was in effect on the date of the accident.

{¶141} Most of the other contested paragraphs are a sequence of factual events. For instance, they discuss the assignment, the Biglers' $3 million judgment against the Coxes, the suit filed by the Biglers' insurer for reimbursement of $12,000, the fact that Brian Bigler was killed in the accident and Howard Bigler was seriously injured, the amount of the checks written by the Coxes to the insurer, the cancellation notice, the fact that Mrs. Cox alleges that she sent a $5 check in order to appeal the cancellation, the fact that Boyle faxed a newspaper clipping of the accident to the insurance company, the denial of coverage, the fact that the insurer had the opportunity to settle with the Biglers for the full policy limits of $50,000 in return for a full release, and the dates on which each event occurred.

{¶142} The insurance company does not argue to this court that the facts provided were disputed or were incorrect. The insurer complains that the factual charge was crafted to favor the plaintiffs, but they do not raise the specific objections to wording that they did below. Rather, the argument here is that the giving of the facts was improper and prejudicial due to the fact that the jury did not have to engage in as much factual ascertainment as it normally would have.

**{¶143}** In general, it is stated that requested instructions should be given if they are correct statements of the law, applicable to the facts in the case, and reasonable minds could reach the conclusion sought by the specific instruction. *See, e.g., Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). A trial court must fully and completely give jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as fact finder. *See, e.g., State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990).

**{¶144}** Pursuant to Civ.R. 51(A), "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury *on the law* as set forth in the requests." (Emphasis added.) Nevertheless, Civ.R. 51(B) provides: "At the commencement and during the course of the trial, the court may give the jury cautionary and other instructions of law relating to trial procedure, credibility and weight of the evidence, and the duty and function of the jury *and may acquaint the jury generally with the nature of the case.*" (Emphasis added). This provides the trial court with some authority to relate some facts and arguments of the parties even in the final instructions (as this is still "during the course of trial"). Thus, the insurer's argument would have to be that the court's factual recitation here went beyond "aquaint[ing] the jury generally with the nature of the case." *See* Civ.R. 51(B).

**{¶145}** It is the jury's function to remember the facts and make its own conclusions as to what facts are important. Yet, counsel can remind the jury of the facts and testimony in closing argument. A court can tell the jury what certain testimony was where the jury submits a jury question to the court asking about said testimony. *See, e.g., State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 123; *State v. Hommes*, 11 Dist. No. 2005-A-0024, 2006-Ohio-2645. The parties can participate in the drafting of the answers, and here, the court considered every specific argument made and agreed to most changes. We do recognize however, that the instructions were provided prior to any jury questions here.

{¶146} However, actions of the trial court to acquaint the jury with the nature of the case are discretionary. *See, e.g., State v. Frost*, 14 Ohio App.3d 320, 322, 471 N.E.2d 171 (11th Dist.1984) (finding an abuse of discretion where court answered jury questions by examining officer in front of jury as this was more than merely "repeating, in some fashion, the evidence or testimony offered during the trial itself."). In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995).

{¶147} The plaintiffs emphasize the complexity of the case, and we note that the provision of dates in a case such as this can be seen as helpful. We express some concern with a potential for interfering with the jury's deliberative process on some of the factual matters. However, the jury instructions informed the jury that they were sole and exclusive judges of the facts, the weight of the evidence, and the believability of the witnesses and that the burden was on the plaintiffs to prove the facts necessary for their case. Moreover, the instructions introduced the testimony recap by stating, "Plaintiff's rely upon the following * * *." And the recap concluded by noting that the insurer denied that the recitation was an accurate one. We emphasize that the limited facts provided in the contested numbered paragraphs are not disputed or said to be incorrect in this assignment of error. Finally, the significant redrafting participation by the insurance company and the court's alterations based upon this participation, although not grounds for waiver, temper any prejudice which could have arisen. We do not find reversible error under this assignment of error.

## ASSIGNMENT OF ERROR NUMBER NINE

{¶148} The insurance company's ninth assignment of error provides:

{¶149} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY PERMITTING HEARSAY TESTIMONY FROM KATHRYN COX CONCERNING CONVERSATIONS DONALD COX HAD WITH BOYLE AGENTS."

{¶150} The insurance company argues that Mrs. Cox should not have been able to testify to conversations Mr. Cox had with insurance agents outside of her

presence. Mrs. Cox initially testified that she contacted the agency and was told that the policy was still effective until a decision was made on the appeal or she got her money back. (Tr. 749). In later discussing the effects of the lawsuit on Mr. Cox, Mrs. Cox described his stress and anger and then said, "And especially because he knew that before this accident, we were told that that insurance was in place, until that appeal was processed or we got the money back. And he even spoke to Mike Gerevics himself. And that, he was very upset." (Tr. 770-771). *No objection was made.*

**{¶151}** She was then asked if the fact that Mr. Cox spoke to that agent gave her comfort in thinking they were covered, and she answered affirmatively. (Tr. 771). *No objection was entered to this question or answer.* She was then asked what she remembered about Mr. Cox's conversation with the agent. It was not until this point that the insurance company objected on hearsay grounds. (Tr. 771).

**{¶152}** The plaintiffs responded that the question was being asked to show her state of mind as to feeling she was covered as opposed to the truth of the matter asserted. The insurer replied that she necessarily had to rely on hearsay to form her impression. The plaintiff agreed to rephrase the question (and the court mentioned a possible alternative method of introducing the testimony.) Mrs. Cox was then asked if she learned that Mr. Cox spoke to the agent, and she said yes and she explained how she remembered that Mr. Cox went to the agency based upon other occurrences in their lives. (Tr. 772-773). Counsel then moved on to question her about the lawsuits filed. (Tr. 773-774).

**{¶153}** *Thus, she never did relate the details of Mr. Cox's conversation in the direct examination cited to us by the insurer here after the insurer's objection was lodged.* In fact, what an agent told Mr. Cox about the appeal was thereafter elicited *during cross-examination.* (Tr. 833). Although this may have been to clarify that her original testimony at page 749 (that she was told an appeal would stay the cancellation) was inaccurate (as that information was given to Mr. Cox not her), that testimony was not objected to at the time and no motion to strike was subsequently made; nor is page 749 cited to this court on appeal. (Tr. 850).

{¶154} The only objection entered on hearsay was essentially sustained. (Tr. 771). A potential ruling on an alternative method of introducing the testimony was delayed and then never made because the plaintiff backed off that line of questioning. Objections were not made at the proper points, and the defense elicited testimony at other points. As such, the particular argument raised on appeal is overruled.

ASSIGNMENT OF ERROR NUMBER TEN

{¶155} Appellant's tenth assignment of error contends:

{¶156} "THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶157} Weight and sufficiency are distinct concepts in the civil law as well as the criminal law. *Eastley v. Bolkman*, 132 Ohio St.3d 328, 972 N.E.2d 517, 2012-Ohio-2179, ¶ 9-13, 17, applying *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). Only weight of the evidence is raised in this assignment of error. Weight of the evidence concerns "the inclination of the greater amount of credible evidence" supporting one side of an issue as the jury weighs the evidence in their minds. *Eastley,* 132 Ohio St.3d 328 at ¶ 12. "Weight is not a question of mathematics, but depends on its effect in inducing belief" or persuasion. *Id.* at ¶ 11-12, 19 (as opposed to sufficiency which deals with adequacy of the evidence as a matter of law).

{¶158} When evaluating whether the judgment is contrary to the manifest weight of the evidence, every reasonable presumption must be made in favor of the judgment. *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. If the evidence is susceptible to more than one construction, the reviewing court is bound to interpret the evidence in a manner consistent with the verdict and judgment. *Id.*

{¶159} "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio Constitution, Article IV, Section 3(B)(3). *See also Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198 (reinstating jury verdict because non-unanimous appellate court voted to reverse the verdict). If a

unanimous appellate court concludes that the jury verdict is contrary to the manifest weight of the evidence, the case is remanded for a new trial. *Eastley,* 132 Ohio St.3d 328 at ¶ 22. And, the Ohio Supreme Court has stated that it "will not review a determination by a court of appeals that a verdict or finding is against the weight of the evidence." *Id.* at ¶ 18, citing *Bown & Sons v. Honabarger*, 171 Ohio St. 247, 168 N.E.2d 880 (1960).

**{¶160}** First, the insurance company presents a two sentence argument concerning Mr. Cox's non-economic loss. The insurer states that more than $1.5 million of the $6 million in compensatory damages awarded to Mr. Cox was for non-economic loss such as pain and suffering and asserts that this award for non-economic loss was not supported by the evidence at trial because Mr. Cox did not testify.

**{¶161}** The plaintiffs respond that much of Mrs. Cox's testimony about what happened to her also concerned what happened to Mr. Cox as they were married and lived together at the time. And, Mrs. Cox testified about Mr. Cox's emotional state without objection. She stated that the situation was emotionally stressful on him. He was already in pain and had problems thinking. He would get angry and he was very upset because he believed he had coverage. (Tr. 770-771). Mrs. Cox said they had no assets to satisfy the Biglers. (Tr. 777-778). And, testimony showed that the Biglers offered to settle for the full policy limits of $50,000.

**{¶162}** The jury was instructed that non-economic loss included annoyance, aggravation, inconvenience, worry, anxiety, concern, embarrassment, mental anguish, and any other intangible loss under Ohio Jury Instruction CV 315.01(5). The jury awarded Mr. Cox $6 million in compensatory damages and Mrs. Cox $2 million in compensatory damages. We note that it was only Mr. Cox who owed the Biglers $3 million plus interest. If the evidence was not against the manifest weight of the evidence as to Mrs. Cox's compensatory damages (which is not raised here), then it is difficult to conceive how it was against the manifest weight of the evidence as to Mr. Cox's merely because he did not testify.

**{¶163}** The insurance company cites nothing in support of an argument that a person must testify in order to persuade a jury of their damages. In cases involving a subsequently deceased individual, such testimony does not exist. A jury is not precluded from being persuaded on damages for one plaintiff merely because that plaintiff does not testify, especially where testimony is presented by that plaintiff's spouse at the time of the behavior at issue who encountered the same actions and is suing on the same grounds. We cannot conclude that any damages involving Mr. Cox's non-economic loss were against the weight of the evidence based upon his failure to testify. We also refer back to assignment of error number six (regarding defense counsel's desire to comment on Mr. Cox's failure to testify) for an explanation of how "under some circumstances" (such as where the record shows why the person did not testify or why the person would not reasonably be expected to explain his position), such comments may not be warranted.

**{¶164}** The insurance company also briefly argues that the award of punitive damages was against the weight of the evidence. The insurer contends that the evidence did not establish actual malice and complains that no financial evidence about the insurance company was presented in order to determine a reasonable amount of punitive damages.

**{¶165}** However, a plaintiff has no burden to provide evidence of the defendant's financial situation in order to recover punitive damages. *Wagner v. McDaniels*, 9 Ohio St.3d 184, 186-187, 459 N.E.2d 561 (1984). If the insurance company wished to show that its financial situation was a pertinent factor in a lesser punitive damage award, it should have placed such evidence in the record. *See id. See also Dick v. Tab Tool & Die Co., Inc.*, 5th Dist. No. 2008-CA-0013, 2008-Ohio-5145, ¶ 37 (defendant did not provide financial information at trial and so cannot argue such factor in appealing punitive damages).

**{¶166}** As for actual malice, the actual malice required to support an award of punitive damages is either: (1) a state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing

substantial harm. *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 473 575 N.E.2d 416 (1991), citing *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987). The jury was only instructed on the second type of actual malice here.

{¶167} The testimony provided by the plaintiffs and also by the defense set forth evidence by which a rational juror could be persuaded that the insurer consciously disregarded the rights of others and that this had a great probability of causing substantial harm. The great probability of substantial harm does not appear to be disputed by the insurer: Mr. Cox was in an accident while driving his wife's car, he was sued due to the death and injury of others, he obtained counsel, his insurer would not provide coverage, he has a large judgment against him, etc.

{¶168} The insurer's contention appears to revolve around the conscious disregard portion of the test. Testimony regarding the lack of investigation was presented. All the insurer did was ensure a cancellation letter had been sent to the Coxes and the cancellation date in the letter had passed by the time of the accident, without ascertaining the need for an SR-26. The insurer never sought a legal opinion notwithstanding the letters and/or requests for coverage from both the insureds' attorney and the injured parties' attorney. Moreover, a note had been placed in the insurer's file that a legal opinion on the issue of the SR-26 may be warranted.

{¶169} An expert found the lack of investigation to be astounding. The jury heard testimony about how adjusters receive bonuses for closing cases. The jury saw the testimony of the insurance company representatives involved in this case. It was up to the jurors to judge their credibility on the stand regarding their state of mind and lack of regard. We give great deference to the jurors' decision on such matters. *See, e.g., Austintown Ambulatory Emergency Room v. Mansour*, 7th Dist. No. 10 MA 152, 2011-Ohio-4559, ¶ 28, citing *Seasons Coal*, 10 Ohio St.3d at 80–81 (opportunity to observe demeanor, gestures, and voice inflections and to use these observations in weighing credibility).

{¶170} The presence of actual malice need not be express but may be inferred from conduct and circumstances. *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 37, 543 N.E.2d 464 (1989). The finding of a conscious disregard for the

rights and safety of other persons that has a great probability of causing substantial harm is one reasonable construction of the evidence presented. Although another rational juror could rationally conclude that this case did not involve conscious disregard, this does not mean that the evidence and the inferences to be drawn therefrom cannot be interpreted by some rational juror as a conscious disregard for the rights of those found to be insureds. *See, .e.g., Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 558, 644, N.E.2d 397 (1994) (where record reveals one-sided inquiry by insurer and failure to conduct adequate investigation, punitive damages found justified).

**{¶171}** Finally, we turn to what appears to be the insurer's main argument here: "It is the cumulative effect of the numerous prejudicial and reversible errors committed by the trial court that renders this jury verdict against the manifest weight of the evidence." The insurer lists arguments set forth in prior assignments of error and adds a few other legal arguments on evidentiary issues not previously briefed.

**{¶172}** The plaintiffs urge that the argument regarding the cumulative effect of legal and evidentiary errors is not properly part of a manifest weight analysis. The test for a manifest weight review was set forth above. The insurer raises a distinct issue regarding cumulative error of the trial court in making various rulings. The insurer cites to no authority regarding the proper application of this doctrine in a civil case.

**{¶173}** The Supreme Court has stated within a civil case: "Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980), quoting *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349, 91 N.E.2d 690, ¶ 3 of syllabus (1950). The Court specifically referred to the plural "errors" in evaluating substantial justice. However, that case dealt with only one type of error in

admitting portions of a treatise and did not specifically deal with the cumulative error doctrine.

{¶174} The Tenth and Eleventh Districts have stated that the cumulative error doctrine is not typically employed in civil cases. *See Westlake v. Ohio Dept. of Agriculture,* 10th Dist. No. 08AP-71, 2008-Ohio-4422, ¶ 25; *Sykes v. Gen. Motors Corp.,* 11th Dist. No. 2003-T-0007, 2003-Ohio-7217, ¶ 39. The Twelfth District has also expressed reluctance to apply the doctrine to civil cases. *Allen v. Summe*, 12th Dist. No. CA92-04-067 (May 17, 1993). The Second District has wavered back and forth on the application of the doctrine to civil cases. *See Ratliff v. Brannum*, 2d Dist. No. 2008-CA-05, 2008-Ohio-6732, ¶ 155-156 (recognizing this wavering, and then finding that resolution of the conflict need not be made in that case as there was not more than one harmless error).

{¶175} On the other hand, the Eighth District has stated that "the extension of the cumulative error doctrine to civil cases is warranted where the court is confronted with several errors, which either are harmless individually or have marginally prejudicial effects, but combine to require a new trial. *Edge v. Fairview Hosp.*, 8th Dist. No. 95215, 2011-Ohio-2148, citing *Dawson v. Cleveland Metro. Gen. Hosp.,* 8th Dist. Nos. 51052 and 51779 (Nov. 20, 1986). We agree with this position.

{¶176} It is not the application of the exact test from criminal cases, but it allows review of all the harmless errors to ascertain if the combined effect prejudiced the complaining party's substantial rights. *See* Civ.R. 61 (which calls for an evaluation of substantial rights in conducting a harmless error analysis). As cumulative error deals with the effect of multiple errors, the doctrine is irrelevant if there were no errors found harmless in the preceding assignments or only one error was found harmless. *See State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). *See also Ratliff*, 2d Dist. No. 2008-CA-05 at ¶ 155-156.

{¶177} We cite to our resolution of the prior assignments of error to eliminate from this review the claimed errors that we found were not errors at all or that we found were rendered moot. And, a claim which is mentioned only as a bullet point in the insurer's list and which was not previously briefed under an assignment of error

cannot be evaluated, as arguments must be properly briefed to require our review. *See* App.R. 12(A)(2); App.R. 16(A)(7). Moreover, an assignment of error that simply intones the phrase "cumulative error" but offers no analysis or argument constitutes an assignment of error without substance. *See State v. Bethe*l, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197.

**{¶178}** In any event, we do not find that multiple errors here combined to require a new trial. *See Edge*, 8th Dist. No. 95215, citing *Dawson,* 8th Dist. Nos. 51052 and 51779. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER ELEVEN</u>

**{¶179}** The insurance company's eleventh assignment of error provides:

**{¶180}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING THE DEFENSE'S DIRECTED VERDICT SINCE THE ACTUAL WRITTEN ASSIGNMENT WAS NEVER INTRODUCED INTO EVIDENCE BY THE BIGLERS."

**{¶181}** After the plaintiffs rested their case, the insurer moved for directed verdict as to the Biglers' claim on the ground that it was dependent on the written assignment, but such assignment was not admitted into evidence. The plaintiffs responded that the court already ruled as a matter of law that the assignment was proper and that the Biglers could be parties to the case. The plaintiffs stated that there was no requirement that the assignment be in writing, let alone introduced as an evidentiary exhibit. (Tr. 856). The court denied the motion for directed verdict. (Tr. 857).

**{¶182}** On appeal, the insurer contends that the failure to produce the written assignment violated the Best Evidence Rule in Evid.R. 1002, stating that a document other than the original writing can only be used if the original has satisfactorily been shown to be lost or destroyed. The plaintiffs counter that they were not required to formally introduce the assignment into evidence, noting that the assignment was available to all parties as evidence, its validity and effect was already ruled upon by the trial court, and it was not at issue in this trial. The plaintiffs alternatively state that any best evidence claim was waived and would not justify a directed verdict, pointing

out that the insurer did not object to testimony of Attorney Blass, who was partially responsible for drafting the assignment and who testified to its terms.

{¶183} Specifically, Attorney Blass testified that after judgment was awarded against Mr. Cox in favor of the Biglers, he discussed an assignment with the Biglers' attorney as he wanted the Biglers to refrain from immediately pursuing the judgment against Mr. Cox and he believed that Mr. Cox had a valuable asset in the form of the bad faith claim against the insurance company. (Tr. 438). He was also asked why the agreement was 60% to the Biglers and 40% to Mr. Cox. (Tr. 439). *No objections were entered* relevant to the issue of best evidence or the contents of the writing.

{¶184} *The insurance company then cross-examined Attorney Blass on the assignment and assignments in general.* The witness noted that one purpose of the assignment was related to the fact that the BMV would take away driving privileges if a driver has an unpaid judgment against them from a wreck. (Tr. 455). *The insurance company's attorney stated*: "So there was an agreement between the Biglers and the Cox[es]. Basically, the deal is that in exchange for the value of the assignment, which was the claim against Personal Service, the Biglers agreed not to execute on that judgment, at least during the pendency?" (Tr. 455).

{¶185} The witness answered that if they were successful in the prosecution of the assigned claim, then they would not execute. (Tr. 455). *Defense counsel thereafter elicited* that the Biglers were entitled to 60% of any recovery on the claims assigned to them, and that he did not know what their attorney was entitled to. (Tr. 465). *Defense counsel continued*, "And so the assignment, though, they -- Mr. Cox would still get 40 percent of any recovery against PSI; is that right?" (Tr. 466).

{¶186} In fact, *prior to this testimony*, the plaintiffs put on the testimony of the Bigler representative to show that in 2003, they were prepared to accept the $50,000 policy limits. (Tr. 367-368). *On cross-examination*, *the defense asked* if he had a deal with Mr. Cox, and he answered that there is an agreement between the attorneys to pursue the matter. (Tr. 369). *The defense then asked* what the arrangement on splitting the proceeds was, and he answered that 60% would come to his family and 40% would go to Mr. Cox. (Tr. 369-370).

**{¶187}** Initially, we emphasize that the insurer did not actually raise the best evidence rule in making its comments below. It is improper to raise a new ground for objecting for the first time on appeal. *See, e.g., Kent v. State*, 42 Ohio St. 426, 430 (1884); *Walton v. Bengala*, 7th Dist. No. 00CA08 (Sept. 10, 2001). The best evidence rule (*which is the only matter raised on appeal*) is an evidentiary matter, not a matter of sufficiency, which is what a directed verdict motion deals with. *See* Civ.R. 50(A)(4) (a motion for directed verdict can be granted only if the court has construed the evidence most strongly in favor of the non-movant and still finds that reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to the non-movant). *Compare* Evid.R. 1002 (to prove the content of a writing, the original is required); Evid.R. 1003 (duplicates generally admissible); Evid.R. 1004 (exceptions if original in other's possession and for collateral matters).

**{¶188}** Likewise, as the plaintiffs point out, there was no evidentiary objection during the testimony presented by the plaintiffs on the writing. *See* Evid.R. 103(A)(1) (timely object and state the specific ground of objection). Furthermore, this case presents more than a mere failure to object in a timely manner. As shown in the recitation above, *the defense* introduced the existence of the assignment and its relevant terms into evidence first and now seeks to claim that this testimony it elicited was improper under an evidentiary rule. Plus, the assignment was not the document on which this trial was based. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWELVE

**{¶189}** Appellant's twelfth assignment of error provides:

**{¶190}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY AWARDING PLAINTIFFS 100% OF THE REQUESTED ATTORNEYS' FEES."

**{¶191}** After the jury found that plaintiffs were entitled to recover attorneys' fees, the trial court reviewed fee petitions from Bordas and Bordas, PLLC, who was hired by the Coxes, and Attorney Harry White, who was hired by the Biglers. At the fee hearing, Attorney Bordas and Attorney White testified in support of the petitions

and presented the expert testimony of Attorney John Triplett Jr. The insurance company presented the expert testimony of Attorney Michael Marando, who expressed concerns with the time record reconstructions of Attorneys Bordas and White, the hourly rate, and the quarter-hour billing increments. Upon completion of the hearing, the court asked for proposed findings of fact and conclusions of law and adopted the plaintiffs' submission.

{¶192} The court agreed that 1,290 hours represented a reasonable total number of hours for the staff at the Bordas firm and 509.50 hours represented a reasonable number of hours for Attorney White. The court awarded the requested hourly rate of $400 per hour to Attorney Scott Blass, Attorney James Bordas III, and Attorney Harry White. The court also awarded $300 per hour for two other attorneys, $200 per hour for another two attorneys, $95 per hour for an IT specialist, and $75 per hour for two paralegals. As the plaintiffs requested, the court adjusted the lodestar amount upward by a 2.0 multiplier. This created a total attorney fee award of $860,742.50 for the Bordas firm and $407,600 for Attorney White. The attorneys were also reimbursed for expenses in the amounts of $53,376.05 and $16,932.98.

{¶193} A trial court has discretion to determine the appropriate amount of attorneys' fees to award in each case, and thus, a fee award is not overturned on appeal absent an abuse of discretion. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146, 569 N.E.2d 464 (1991). Generally, an abuse of discretion can be found where the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Still, it has been stated: "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Bittner,* 58 Ohio St.3d at 146. This is because the trial judge participated not only in the trial but in the preliminary proceedings and thus occupies the best position to gauge the value of services rendered by lawyers who have tried the case in that court. *Id.*

{¶194} The calculation begins by multiplying the number of hours reasonably expended by a reasonable hourly rate, which provides an objective basis as to the initial estimate of the value of the lawyer's services. *Id.* at 145. This is known as the

"lodestar" amount. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware I*). Once the lodestar is calculated, the trial court may modify the baseline calculation upward or downward based upon a consideration of the factors contained in Ohio Prof. Cond. Rule 1.5(a), which is discussed infra. *Bittner,* 58 Ohio St.3d at 145-146, applying former Ohio Code Prof. Resp. DR 2-106(B), now Ohio Prof. Cond. Rule 1.5(a).

{¶195} The insurance company argues that the fee award and the use of a 2.0 multiplier was an abuse of discretion based upon three main arguments: (1) the attorneys did not keep contemporaneous time records until 2010; (2) the attorneys used quarter-hour billing increments instead of tenth-hour increments; and (3) $400 per hour is not a reasonable rate.

<u>Reconstructed Time Records</u>

{¶196} An attorney should keep an accurate record of time and resources expended in order to be able to provide satisfactory proof of the reasonable value of the legal services. *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry* 68 Ohio St.3d 570, 576, 629 N.E.2d 431 (1994) fn. 3. The Supreme Court recognized that attorneys operating under a contingency contract sometimes do not maintain detailed records of their hours and noted that the lack of accurate record-keeping "sometimes" makes it difficult to establish the reasonable value of services. *Id.* (and remanding where attorney was seeking to recover in quantum meruit after being terminated).

{¶197} Contemporaneous time records are preferred, but not required. *Miller v. Leesburg*, 10th Dist. Nos. 97APE10-1379, 97APE10-1380 (Dec. 1, 1998) (upholding trial court's reduction by 40% where broad estimates were used in reconstruction). As contemporaneous time records are "not absolutely mandatory in making a determination of fees," reconstruction by the attorney and confirmation by an expert is permissible. *In re Estate of Wood*, 55 Ohio App. 2d 67, 75, 379 N.E.2d 256 (10th Dist.1977) (party requesting fees presented testimony regarding the attorney's hourly rates, the reasonableness of the charges, and an estimation by an expert on hours spent). The Sixth District has also upheld the acceptance of a

reconstructed time statement, and being especially assured by the testimony stating that the reconstruction was a conservative calculation of the hours expended. *Furr v. State Farm Mut. Auto. Ins. Co.*, 128 Ohio App.3d 607, 627, 716 N.E.2d 250 (6th Dist.1998).

**{¶198}** Unlike the scenario presented in this court's *Unick* case, the bills here were itemized with date, activity, and amount of time spent per activity. *See Unick v. Pro–Cision, Inc.*, 7th Dist. No. 09MA171, 2011–Ohio–1342, ¶ 27,¶ 35-37 (where one bill was a flat fee of $15,000 with no explanation of the hours worked or rates charged; and one bill listed dates and action but no time expended on the actions and no statement of the rate charges and it appeared that the bill included fees for causes of action for which attorney fees were not recoverable). The attorneys explained that because they typically work on a contingency fee basis, they did not keep contemporaneous time records during the first several years of the litigation, noting that it was rare for this type of case to get to the attorney fee stage as settlement is usual.

**{¶199}** The attorneys assured the court that the reconstructed billing statements were based solely on completed work that was supported by documentation in the file. (Tr. 9-11, 36, 44). Moreover, their expert testified that he did not see much billed for strategy analysis, which takes a lot of time in cases of this magnitude, and he opined that the file reconstruction was conservatively constructed, which decreased the plaintiffs' probable actual total hours. (Tr. 59, 61).

**{¶200}** In sum, the attorneys reconstructed their records by spending many (uncharged) hours physically reviewing the litigation file and providing itemizations based only on services that were confirmed by documentation. The trial court presided over the case throughout its long history and had before it the file and its contents, including much of the discovery material. And, the trial judge specifically pointed out that it analyzed the itemization in light of what the court saw in the motion practice and in the courtroom and found it corroborative of the claim that the services were actually performed. The trial court could rationally find that the itemizations did not overstate the work actually performed and thus could be used in the lodestar

calculation. *See Julian v. Creekside Health Ctr.*, 7th Dist. No. 03MA21, 2004-Ohio-3197, ¶ 100 (trial court is in the best position to determine if fee request was accurate). We find no abuse of discretion in the trial court's acceptance of the reconstruction.

Quarter Hour Billing Increments

**{¶201}** The insurance company contends that the trial court improperly used quarter hour billing increments. The insurer argues that tenth of an hour increments are the more precise method. Their expert testified that his practice (and other practices that he has seen) bills in tenth of an hour increments as it is more respectful of the "reasonableness" requirement in fee calculation. (Tr. 111, 113).

**{¶202}** The plaintiffs urge that the trial court was entitled to accept their expert's testimony and conclude that quarter hour increments were appropriate. Their expert testified that most national clients do not like quarter hour billing, but in his experience, it is standard in that region (tried in Belmont County) to bill by the quarter hour in the absence of a specific contractual agreement to the contrary. (Tr. 61-62). That expert's firm uses quarter hour billing, including in cases involving publicly traded companies. (Tr. 62).

**{¶203}** The insurer cites us no case law specifically supporting its billing increment argument. We recognize that quarter-hour billing increments have been frowned upon by some judges as fee-enhancing as applied to certain services in certain cases. *See Bench Billboard Co. v. City of Toledo*, 759 F.Supp.2d 905, 913-914 (N.D.Ohio 2010) (reducing hours due to quarter-hour billing increments).

**{¶204}** We also note that when *Bench Billboard* was upheld on appeal, it was specifically noted that the trial judge *did not* state that quarter-hour billing increments are per se unreasonable. *Bench Billboard Co. v. City of Toledo*, 499 Fed.Appx. 538, 549 (C.A.6 2012) (trial court discretion to reduce hours on belief that quarter-hour timekeeping was inappropriate in a statutory civil rights action). *See also Diffenderfer v. Gomez-Colon*, 587 F.3d 445, 455 (1st Cir.2009) (explaining the reduction imposed by the district court was not due to a finding that billing in quarter-hour increments per se unreasonable).

**{¶205}** Furthermore, Attorney Bordas testified that he rarely charges for items that take less than 15 minutes, and when provided with an example of a task that opposing counsel did not believe would take 15 minutes, he was able to explain why it would in fact take 15 minutes to fully process and respond to the document. (Tr. 31-34). Attorney White also referred to this testimony and pointed out that in the examples provided, he is not merely reading a document. (Tr. 46). Lastly, as aforementioned, the attorneys excluded items from their itemization that could not be supported by physical documentation in the file. Based on these factors, we cannot conclude that the trial court's acceptance of the attorneys' use of quarter hour billing increments was unreasonable.

Hourly Rate of $400

**{¶206}** *As aforementioned, the starting point for the fee award is the reasonable number of hours multiplied by a reasonable hourly rate. Bittner,* 58 Ohio St. 3d at 145. The insurance company contends that the weight of the evidence demonstrated that $400 per hour is not a reasonable rate. Their expert testified that the top rate for this case should be $250 per hour. (Tr. 120). He opined that this case was not highly complex and said he was not familiar with anyone charging $400 per hour in similar coverage cases that he has been involved in. (Tr. 120). He did appear to thereafter suggest that the contingency agreement and the results obtained could justify the hourly rate here, just not the multiplier. (Tr. 128) (stating that it was a contingency case with an "excellent result," and when asked if that is to be reflected in the hourly rate, he answered, "I do. I think that's the reason that he gets the top end of what a reasonable range is for this region * * *").

**{¶207}** The plaintiffs urge that the $400 per hour figure was supported by the record, which indicates their specialization in this type of litigation and shows they possess recognized skill and expertise in this area. Attorney White stated that his eventual fees in contingency cases have ranged as high as $2,500 per hour, that his hourly rates vary, he is known to charge $150 per hour in basic cases, and that he has no cases in his office now where the client agreed to pay $400 per hour. (Tr. 49-50); Affidavit. Attorney Bordas testified that his firm charges in the $400 range for

partners in cases not involving a contingency fee agreement. (Tr. 11-12). He said that in consulting with other attorneys on bad faith claims after seminars that he attended, he has viewed their contracts and noticed that their fees are in line with his. (Tr. 11).

{¶208} The plaintiffs' expert also testified that the $400 hourly rate was fair and reasonable given the experience and reputation of the lead attorneys. (Tr. 55-56, 58, 69-71, 76). He personally viewed a fee contract with a Bordas client that charged $400 per hour. (Tr. 73). He stated that it took a high degree of professional skill to be involved in this case, along with significant legal and courtroom experience. (Tr. 69-70). He testified that this was a "very complex, very difficult case," and Attorney Bordas testified that this was the "most complex insurance bad faith case that he has been involved in." (Tr. 17, 69).

{¶209} The trial court determined that the $400 figure was supported by the record and stated that the hourly rates were consistent with those allowed in other regional cases, citing *McLaughlin v. American Electric Power Serv. Corp.*, Washington County Case No. 10OT50 and a West Virginia trial court case attached to the petition. It was within the trial court's province to accept the testimony on the attorneys' expertise, skill, and other successes and the fees charged by the Bordas partners when they do not work under a contingency agreement and to find that Attorney White was also justified in seeking that figure here. The court was familiar with the complexities of the case, and was not required to accept the insurer's expert's testimony that the case was not complex. The acceptance of $400 as the hourly rate for the lead attorneys was not unreasonable in this case based upon the trial court's evaluation of the conflicting testimony on what is a reasonable rate for the caliber of attorney said to be needed and used here.

Use of a Multiplier

{¶210} *Again, the starting point for the fee award is the reasonable number of hours multiplied by a reasonable hourly rate. Bittner,* 58 Ohio St. 3d at 145. Pursuant to the case law in Ohio, the trial court can then modify the baseline calculation upward or downward based upon a consideration of the following factors:

**(1)** the time and labor required, the novelty and difficulty of the questions involved, and the requisite skill; **(2)** the likelihood, if apparent to the client, that the acceptance of the case will preclude other employment by the lawyer; **(3)** the fee customarily charged in the locality for similar legal services; **(4)** the amount involved and the results obtained (including the degree of success); **(5)** the time limitations imposed by the client or by the circumstances; **(6)** the nature and length of the professional relationship with the client; **(7)** the lawyers' experience, reputation, and ability; and **(8)** whether the fee is fixed or contingent. *Bittner,* 58 Ohio St.3d at 145-146, applying formerly Ohio Code Prof. Resp. DR 2-106(B), now Ohio Prof. Cond. Rule 1.5(a). [6]

**{¶211}** The petitions requested that a 2.0 multiplier be applied to the lodestar amount, outlining the various pertinent factors applicable to fee enhancement in Ohio. The trial court agreed that the requested enhancement was appropriate. The court pointed to the complexity of the legal issues and the discovery exchange. The court praised the quality of the work performed, stating that it had not been surpassed at any time in the judge's experience. The court found it undisputed that the attorneys passed up other work in order to present this litigation. The court referred to the results obtained in the high monetary judgment of more than $10 million. The court also pointed out that the contingency fee contract entered by the Coxes allowed for approximately $2.2 million in fees (and more if it went to appeal). And, the court's award resulted in a total fee of $1,268,342.50.

**{¶212}** "The ultimate determination of reasonableness must take into consideration all the factors relating to reasonableness of the fees in the particular case. *Wood*, 55 Ohio App. 2d at 73-74 (noting that the facts and circumstances vary so much from case to case that it is impossible to set forth a blanket rule other than

---

[6] We note that the United States Supreme Court has stated that there is a strong presumption as to the reasonableness of the lodestar and that an enhancement should be reserved for rare circumstances in which the lodestar does not adequately take into account a factor important to determining a reasonable fee. *Perdue v. Kenny A.,* 559 U.S. 542, 552-553, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) (adding that the lodestar figure typically includes a consideration of most of the relevant factors, and thus an enhancement may result in a double recovery). However, the Ohio

to say that reasonable value must be substantiated by the evidence). Ohio does not use a simple "timeclock method" as "[t]he value of services may be greater or less than that which would be reflected by a simple multiplication of the hourly rate by time expended." *Id.* at 74, reflected later by *Bittner,* 58 Ohio St. 3d at 145-146. *See also The American Chemical Soc. v. Leadscope*, 10th Dist. No. 08AP-1026, 2010-Ohio-2725, ¶ 87-90 (upholding the doubling of the lodestar based mainly upon the existence of a contingency agreement and the outcome of the litigation).

**{¶213}** The second stage *Bittner* factor involving the fee *customarily* charged in the locality for similar services (by others) may be less than the initial fee requested by counsel here and found to be reasonable by the trial court. Yet, the trial court has the discretion as to which facts to apply and how that application will end up adjusting the initial calculation. *See Bittner*, 58 Ohio St.3d at 145-46. Some *Bittner* factors may have been utilized in order to initially calculate the lodestar figure, such as the time and labor required over the years of motion practice and intensive discovery and during the multi-day trial, the length of the attorney-client relationship, the novelty and difficulty of the questions, the fee customarily charged in the locality for similar services (by this firm), and the experience, reputation, and ability of the lawyers. Some of these items could also be relevant to the second stage of the *Bittner* analysis applying the factors, on which the Supreme Court stated: "All factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation." *See Bittner*, 58 Ohio St.3d at 145-46.

**{¶214}** Still, even if we refrain from focusing on items that were likely used to construct the initial lodestar (as suggested by the United States Supreme Court), other important factors remain to justify the multiplier. The quality of the representation in this particular case over the years the court presided over the case was a reasonable factor to utilize in the enhancement decision. That is, a lawyer's pre-existing skill and reputation as set forth by the evidence can justify a high starting

Supreme Court's *Bittner* test does not read as strict. And as discussed infra, not all factors must be taken as having been subsumed within the lodestar formulation here.

hourly rate, but this is distinct from the lawyer's actual quality representation for that particular client as witnessed by the trial court in that case, which can also justify an enhancement.

{¶215} "The trial judge which participated not only in the trial but also in many of the preliminary proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court." *Bittner*, 58 Ohio St.3d at 146. This shows that the ultimate conclusion is to represent the "value of services rendered" as adjudged by the trial court, not merely the lodestar figure. As stated above, the trial court praised the quality of the work performed, stating that it had not been surpassed at any time in the judge's experience. This appraisal was within the trial court's province.

{¶216} Moreover, as the trial court stated, it was not disputed that this case ended up precluding other employment. The testimony suggested that it was not anticipated that this case would reach the trial stage or take so many years. (We note that it was also likely unanticipated that the insurance company would attempt to declare the policy void ab initio seven years after the accident based on a non-driving-related, readily-available, local criminal record.)

{¶217} Additionally, as the trial court emphasized, the results obtained involved a high degree of success and the amount recovered for the plaintiffs was very high. And, the fee was to be contingent. The attorneys took a risk by accepting the case on a contingency basis, a risk which increased as each year passed and each new issue required the expenditure of more time and/or fronting of more expenses. Lastly, the court's award fell well under the contingency agreement. Thus, the court did not burden the losing party with a contract entered by the plaintiffs.

{¶218} In sum, the trial court exercised its discretion to employ the multiplier after considering the pertinent factors in order to ensure the fee reflected the actual value of the services rendered. Under the totality of the facts and circumstances existing in this case, we cannot conclude that this decision was unreasonable,

arbitrary, or unconscionable, and we cannot conclude that the total fee award shocks the conscience.

{¶219} For the foregoing reasons, the judgment of the trial court is hereby affirmed.


Donofrio, J., concurs.
DeGenaro, P.J., concurs.